235 N.J. Super. 298 (1989)
562 A.2d 239
JOHN SAVARESE, ET AL., AND OTHER PERSONS OR ENTITIES SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS,
v.
NEW JERSEY AUTOMOBILE FULL INSURANCE UNDERWRITING ASSOCIATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 2, 1989.
Decided July 26, 1989.
*300 Before Judges PRESSLER, O'BRIEN and STERN.
Joseph B. Thor argued the cause for appellant.
John W. O'Farrell argued the cause for respondent New Jersey Full Insurance Underwriting Association (Francis & Berry, attorneys; John W. O'Farrell, of counsel; John W. O'Farrell and Evelyn C. Farkas, on the brief).
Gale P. Simon argued the cause for respondent State of New Jersey, Department of Insurance (Peter N. Perretti, Jr., Attorney General of New Jersey, attorney; Gale P. Simon, on the brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
Plaintiff John Savarese (Savarese) appeals from the dismissal of his complaint. We affirm.
The parties to this appeal are Savarese, defendant New Jersey Automobile Full Insurance Underwriting Association (JUA), and the intervenor, Department of Insurance of the *301 State of New Jersey.[1] On December 6, 1983, Savarese entered into a producer contract with JUA to represent JUA through the Hanover Insurance Company, one of JUA's servicing carriers, to produce automobile liability and physical damage insurance. Section V of the contract concerns compensation and reads as follows:
A. Commissions shall be paid at the rate prescribed in the association plan documents.
B. Commissions shall be earned by the producer as premium is earned. If coverage is terminated or reduced on any policy, the producer shall refund all unearned commissions to the servicing carrier.
C. The association shall not be responsible for any expenses of the producer.
Notwithstanding this language in his contract, Saverese contends that he and similarly situated producers were entitled to receive commissions on unearned premiums where policies were cancelled for nonpayment of premiums based upon the language of N.J.S.A. 17:22-6.14a, the pertinent part of which read in 1983 as follows:
In the event that a policy is cancelled by the insurer, either at its own behest or at the behest of the agent or broker of record, the unearned premium, including the unearned commission shall be returned to the policy holder. In the event that a policy of automobile insurance issued by the automobile insurance plan established pursuant to P.L. 1970, c. 215 (C. 17:29D-1) or any successor thereto, is cancelled by reason of nonpayment of premium to the insurer issuing the policy or nonpayment of an installment payment due pursuant to an insurance premium financing agreement, the broker of record for that policy may retain *302 the full annual commission due thereon and, if a premium finance agreement is not involved, the effective date of cancellation of the policy shall be no earlier than 10 days prior to the last full day for which the premium paid by the insured, net of the broker's full annual commission, would pay for coverage on a pro rata basis in accordance with rules established by the commissioner. [Emphasis supplied.]
It is Savarese's position that JUA is a "successor" to the Automobile Insurance Plan (AIP), and thus he and similarly situated producers have a statutory right to full annual commissions upon cancellation of a policy for nonpayment of premium notwithstanding the language in their producer contracts.
JUA is a nonprofit, unincorporated association created by the Legislature to provide automobile insurance through normal market outlets at standard market rates to qualified persons who cannot otherwise obtain such insurance. See N.J.S.A. 17:30E-2. This purpose is accomplished through agreements with certain insurers, designated as servicing carriers, who issue policies on JUA's behalf and through agreements made with licensed insurance agents and brokers who bind coverage, collect premiums and issue identification cards on behalf of JUA. JUA has approximately 12 servicing carriers administering its policies and 11,000 agents with producer contracts, of whom Savarese is one operating through the Hanover Insurance Company, a servicing carrier of JUA.
JUA was created by L. 1983, c. 65, §§ 13 to 34, to be effective January 1, 1983, but remained inoperative until January 1, 1984. The Committee Statement to Assembly No. 1696  L. 1983, c. 65[2] explains that:
This bill replaces the Assigned Risk Plan with the New Jersey Full Insurance Underwriting Association which will provide automobile coverage for those individuals who are unable to be written in the voluntary market.
The Statement notes that underwriting losses are to be made up from (1) 80% of the surcharges levied by the Division of Motor Vehicles on a certain class of drivers; (2) 80% of the surcharges levied by JUA on motor vehicle conviction points *303 accumulated within the three years immediately prior to the operative date of the act by drivers insured under AIP; (3) accident surcharges which may be levied by JUA; (4) income from investment of monies collected by JUA, and
5. The residual market equalization charge which is to be levied on all insured automobiles in the voluntary and residual markets, exclusive of principal operators 65 years of age or older....
The statutory enactment creating JUA provides for a commission schedule in N.J.S.A. 17:30E-11, which originally read:
The producer shall receive commissions on association business in accordance with a schedule of commissions promulgated in the plan of operation. The schedule of commissions so promulgated shall be designed to serve and reconcile the following objectives: a. to encourage equal treatment of policyholders in the association and the voluntary market; b. to minimize disincentives to the placement of applicants in the voluntary market; c. to stimulate marketing efforts in underserviced areas; d. to provide reasonable compensation for services performed by producers; e. to provide protection to the producer of record without a voluntary market company, upon the offer of voluntary market coverage to an association insured; f. to provide for an equitable rate of commission for producers during a transition period, as the term of such period is determined by the board. No rate of commission shall be less than that provided pursuant to the automobile insurance plan established pursuant to P.L. 1970, c. 215 (C. 17:29-1), as payable as of December 31, 1981.
Part III of the JUA plan of operation, dealing with "OPERATING PRINCIPLES-PRODUCERS," originally provided:
Section 3: Commissions
Commissions will be earned by producers at the same rate at which premium is earned. Commissions will be paid at the rate of 13% on all policies effective in 1984 and at the rate of 11% thereafter.
When the plan of operation evolved, a question arose whether JUA was a "successor" to AIP and thus required to pay full annual commissions to its producers notwithstanding cancellation of the policy. According to the affidavits of Frank P. Champion and Willard Young, producer representatives on the board of directors of JUA, the issue was resolved by increasing the rate of commission under JUA from that applicable under AIP provided, however, that such commissions would only be earned when the premium is earned. In a reply certification Savarese agrees that the AIP commission was 10%, whereas under JUA it was increased to 13% for 1984 and 11% for 1985. *304 He argues, however, "that the sole reason for the higher commission in 1984 was to compensate the brokers for the vast amount of extra work involved in transferring all insureds to JUA coverage." We conclude that these factual matters in dispute are not material, and JUA was entitled to have the complaint dismissed as a matter of law.
JUA concedes it received two opinions from the Attorney General both concluding it was the successor to AIP and thus bound by the provisions of N.J.S.A. 17:22-6.14a.[3] However, dissatisfied with that opinion, JUA obtained an opinion from independent counsel who disagreed with the position of the Attorney General and advised JUA it was not required to pay producers commissions on policies cancelled for nonpayment of premium. The first such opinion was obtained on October 13, 1983 and reiterated by letter of July 31, 1985. JUA elected to follow the advice of its independent counsel and prepared its plan of operation, required by N.J.S.A. 17:30E-6, which included a section establishing commissions for producers as required by N.J.S.A. 17:30E-11 at the rate of 13% on all policies effective in 1984 and at the rate of 11% thereafter, but providing that "commissions will be earned by producers at the same rate at which premium is earned."
However, in 1985 Insurance Commissioner Hazel Gluck proposed an amendment to Part III of the JUA plan of operation providing for producers' commissions, and certified it to become effective immediately by letter of October 9, 1985, as follows:
Commissions will be earned by producers at the rate at which premium is earned. In the event that an association policy is cancelled by reason of nonpayment of premium to the insurer or payment of an installment payment due under a premium finance agreement, the producer of record shall be entitled to the full annual commission due thereon.
Commissions will be paid at the rate of 13% on all policies effective in 1984 and at the rate of 11% thereafter.
*305 The producers' contracts were amended to incorporate this amendment and read as follows, effective January 1, 1986:
Commissions shall be paid at the rate prescribed in the association plan documents.
Commissions shall be earned by the producer as premium is earned. In the event a policy is cancelled by reason of nonpayment of premium the producer shall be entitled to the full annual commission due thereon. If coverage is terminated for a reason other than nonpayment of premium or is reduced on any policy, the producer shall refund all unearned commissions to the Servicing Carrier.
The Association shall not be responsible for any expenses of the Producer.
By L. 1986, c. 211, § 11, effective January 12, 1987, the Legislature added two new sections to N.J.S.A. 17:22-6.14a, which read as follows:
j. The provisions of subsection b. of this section shall not apply to policies written by the New Jersey Automobile Full Insurance Underwriting Association established pursuant to sections 13 through 34 of P.L. 1983, c. 65 (C. 17:30E-1 et seq.).
k. The New Jersey Automobile Full Insurance Underwriting Association established pursuant to sections 13 through 34 of P.L. 1983, c. 65 (C. 17:30E-1 et seq.), shall not be liable to pay any commissions required by subsection b. of this section on any policies written by the Association prior to January 1, 1986.
As part of the statutory revision the various paragraphs of N.J.S.A. 17:22-6.14a were given small letter designations. The second paragraph was given the designation "(b)" which deals with the subject under consideration.
Committee Statement, Senate, No. 2790  L. 1986, c. 211,[4] states in part:
The JUA, as the association is commonly called, was established by the Legislature in 1983 to supplant the Assigned Risk Plan for private passenger vehicles....
....
The committee has amended the bill to provide that all commissions on policies issued by the JUA be fully earned; thus, if a policy is cancelled before the end of the policy term, a pro rata portion of the commission would be paid to the agent, with the balance being retained by the association. The amendments also clarify the fact that section 1 of P.L. 1970, c. 217 (C. 17:22-6.14a) which deals with the disposition of unearned commission with regard to policies generally, does not apply to the New Jersey Automobile Full Insurance Underwriting *306 Association, and that the association is not liable to pay commissions pursuant to that section on any policies written by it prior to January 1, 1986.... [Emphasis supplied.]
At the same time, N.J.S.A. 17:30E-11 was amended to read as follows:
a. The producer shall receive commissions on association business which shall be designed to provide reasonable compensation for services performed by producers.
b. The rate of commission payable on policies issued by the association after January 1, 1987, shall be 10%, which rate shall remain in effect until January 1, 1988 at which time the rate of commission payable on association policies shall be 9%. This rate shall remain in effect until January 1, 1989, or until the number of drivers insured by the association is no greater than 30% of the aggregate number of insured private passenger automobiles in this State, whichever occurs later, at which time the commission payable on Association policies shall be 8%.
....
d. In the event that a policy issued by the association is cancelled by reason of nonpayment of premium or nonpayment of an installment payment due pursuant to an insurance premium finance agreement, the unearned commission shall be retained by the association and the effective cancellation date of the policy shall be no earlier than 10 days prior to the last full day for which the premium paid by the insured, net of the producer's full annual commission, would pay for coverage on a pro rata basis.
There is no dispute that the only commissions involved in this appeal are for policies issued during 1984 and 1985 which were cancelled for nonpayment of premium and upon which Savarese was not paid a commission on the unearned premium. It is conceded that for the year 1986 such premiums were paid and that the amendment effective January 1, 1987 clearly eliminated any such commissions thereafter.[5] In this setting the matter came before the motion judge for disposition on cross-motions.[6]
*307 In his oral opinion of June 24, 1988, the motion judge, after reciting the position of the parties as to whether or not JUA was a successor to AIP, concluded that the adoption of N.J.S.A. 17:22-6.14a(j) and (k), as explained by the legislative history, clarified the prior law although it did not change it, and that Savarese's claim is explicitly barred by those sections. In response to Savarese's contention that his action was filed before the effective date of those provisions, the court concluded that the statute should be applied retroactively based upon Gibbons v. Gibbons, 86 N.J. 515 (1981). We agree.
The courts of this State have long followed the general rule of statutory construction that favors prospective application of statutes. Id. at 521. However, there are well settled rules concerning the circumstances in which statutes should be applied retroactively: (1) those statutes in which the Legislature has expressed the contrary intent, i.e., that the statute be applied retroactively, id. at 522; (2) where the statute is ameliorative or curative, id. at 523; (3) where consideration of the expectation of the parties may warrant retroactive application of a statute, ibid., and (4) a retroactive application will not result in a "manifest injustice" to a party adversely affected by such an application of the statute. Ibid. In Kendall v. Snedeker, 219 N.J. Super. 283 (App.Div. 1987), we explained that the sole meaning of the ameliorative exception justifying retroactive application was for the decrease of a criminal penalty. Id. at 286-287. However, with respect to the curative exception, we said:
It generally includes `curative acts [which] are made necessary by inadvertence or error in the original enactment of a statute or in its administration.' 2 Sutherland, Statutory Construction § 41.11 at 410 (4th ed. 1973). Under this exception, an amendment to a statute can be given retroactive effect if it is designed merely to carry out or explain the intent of the original statute. Such *308 application is consistent with the general rule that statutes are ordinarily prospective unless the Legislature indicates otherwise. As the court in Pacific Intermountain Express v. National Union Fire Ins. Co., 151 Cal. App.3d 777, 198 Cal. Rptr. 897 (1984) explained:
`[A] statute will not be retroactively applied unless the Legislature clearly intended the law to be retroactive.... This does not apply to an amendment which merely clarifies rather than changes the meaning of the law. The reason for this exception is that no retroactive effect is given because the true meaning of the statute has always been the same.' [151 Cal. App.3d at 787, 198 Cal. Rptr. 897 (citations omitted)]
It is clear that subdivisions (j) and (k) added to N.J.S.A. 17:22-6.14a come within at least two of the prospective application exceptions. Initially, whether JUA is or is not a successor to AIP, which it is not necessary for us to decide, subsection (j) expressly provides that the provisions of subsection (b), which still include the language "or any successor thereto," shall not apply to JUA. Furthermore, subsection (k) specifically provides that JUA shall not be liable to pay any commissions required by subsection (b) on any policies written by JUA prior to January 1, 1986. This is a clear legislative expression of an intent to apply this amendment retroactively. The Committee Statement to Senate No. 2790, quoted above, reflects an intention merely to carry out or explain the intent of the original statute. The language of the producer contracts signed by Savarese and the others reflects that the expectations of the parties were that commissions would be earned by the producer only as the premium is earned and that if the coverage is terminated for nonpayment of premiums the producer shall refund the unearned commission. This was clearly consistent with the JUA plan of operations adopted pursuant to N.J.S.A. 17:30E-11 concerning commissions. The amendment to N.J.S.A. 17:30E-11b simply establishes specific rates covering specific periods of time.
Retroactive application certainly will not cause any "manifest injustice" to Savarese and the other producers. Once JUA was established, there was no further right to commissions for unpaid premiums under the AIP legislation. The contract of the parties specifically provides for the rate of commissions and *309 the Legislature, by the amendment to N.J.S.A. 17:22-6.14a by the addition of subsection (k), clearly provides that JUA is not liable for payment of any such commissions.
We find no merit to Savarese's contention that his federal and state constitutional due process rights were violated by the enactment of subsections (j) and (k) of N.J.S.A. 17:22-6.14a. Savarese argues that they interfere with his vested rights in the commissions earned on policies issued prior to the legislative enactment, that retroactive application of subsection (k) would work a manifest injustice upon him, and that subsection (k) is unconstitutional because it fails to provide a statute of limitations for bringing suit to recover these commissions.
In Pennsylvania Greyhound Lines, Inc. v. Rosenthal, 14 N.J. 372, 384-385 (1954), the Supreme Court defined "vested right" as "a present fixed interest which in right reason and natural justice should be protected against arbitrary state action  an innately just and imperative right that an enlightened free society, sensitive to inherent and irrefragable individual rights, cannot deny." It has long been established that "[t]here can be no vested right in the continued existence of a statute or rule of the common law which precludes its change or repeal." Magierowski v. Buckley, 39 N.J. Super. 534, 558 (App.Div. 1956). A right cannot be regarded as a vested right, unless it is something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws. Levin v. Livingston Twp., 62 N.J. Super. 395, 404 (Law Div. 1960), aff'd in part, rev'd in part 35 N.J. 500 (1961). Legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations, even though the effect of the legislation is to impose a new duty or liability based on past acts. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752, 766-767 (1976).
The intervenor, State Department of Insurance, argues that subsections (j) and (k) do not violate federal due process guarantees because they are simply part of a legislative scheme *310 attempting to adjust burdens and benefits with respect to automobile insurance coverage in this State. We agree. JUA is an attempt by the Legislature to spread the cost of obtaining insurance coverage for those individuals who would not, on an open market, be able to easily obtain the necessary coverage. JUA is funded in part by a residual market equalization charge imposed on each automobile in New Jersey. Refusing to pay commissions on policies cancelled for nonpayment of premium to keep down costs which, in turn, keeps down the amount of that charge needed to keep the JUA going, is not an arbitrary and irrational way to adjust the burdens and benefits of the insurance problems in this State. Rationality must be determined by a comparison of the problem to be remedied with the nature and scope of the burden imposed to remedy that problem. Nachman Corp. v. Pension Ben. Guaranty Corp., 592 F.2d 947, 960 (7th Cir.1979), aff'd 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354, reh. den. 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1137 (1980).
Savarese cannot claim reliance on subsection (b) of N.J.S.A. 17:22-6.14a since JUA, from its inception, refused to pay commissions on anything except an as-earned basis until 1986. The producers contract entered into between Savarese and JUA made the commission payment scheme quite clear.
As long as the legislation under review was enacted to foster a public purpose, is not unreasonable, arbitrary or capricious, and bears a rational relationship to constitutionally permissible objectives, the requirements of due process are satisfied. Windman v. City of Englewood, 200 N.J. Super. 218, 229 (App.Div. 1985). The statute under review in the present case does not result in harsh or oppressive consequences, does not tread on vested rights, and thus does not violate the due process clauses of the federal and state constitutions.
Even if Savarese's producer contract was one of adhesion, as argued by Savarese, we have closely scrutinized it, see Martin v. Educational Testing Service, Inc., 179 N.J. Super. 317, 331 *311 (Ch.Div. 1981), and have determined it to be entirely reasonable and in the public interest.
There is no merit to Savarese's contention that subsection (k) reduced his period for bringing action for his commissions from six years as provided in N.J.S.A. 2A:14-1 to one year. As a curative statute, it made clear that N.J.S.A. 17:22-6.14a(b) was never intended to apply to JUA. Thus, Savarese never had a right of action which has been limited by the amendment adding subsections (j) and (k).
Affirmed substantially for the reasons given by Judge Edward F. Neagle, Jr. in his oral opinion of June 24, 1988 as supplemented by the comments herein. In light of our decision we have not addressed Savarese's claim that the action should be certified as a class action.
NOTES
[1] In December 1986, Savarese filed a complaint against JUA and various insurance companies (the copy provided in the parties' appendices is captioned "Second Amended Complaint"). After an answer was filed on March 6, 1987 by JUA, a stipulation of dismissal was filed with respect to the other defendants. On June 16, 1987, JUA moved to dismiss plaintiff's complaint for failure to state a claim upon which relief could be granted, and plaintiff filed a cross-motion for summary judgment. By order of February 22, 1988, the Department of Insurance intervened because of the attack on the constitutionality of N.J.S.A. 17:22-6.14a(j) and (k). After oral argument on June 24, 1988, the motion judge granted JUA's motion to dismiss and denied Savarese's motion for summary judgment. A second action entitled "First City Insurance Agency v. State Farm Mutual Automobile Insurance Co., et al.," bearing Docket No. W-008559-86 was disposed of by the same order for judgment in favor of JUA, which also denied a motion for summary judgment by First City Insurance Agency. First City has not filed a notice of appeal.
[2] This Statement is found after N.J.S.A. 17:29A-33.
[3] We are not bound by the opinions of the Attorney General. See Boylan v. State, 222 N.J. Super. 313, 326 (App.Div. 1988), certif. granted 111 N.J. 648 (1988).
[4] This Statement is found after N.J.S.A. 17:30E-3.
[5] According to a certification of Nelson D. Ealey, General Manager of JUA, Savarese sold his agency on July 30, 1986 to Topex Agency, Inc., and his contract with JUA was terminated, to which Savarese responds that his agency was merged into Topex, through whom he is still writing policies through JUA as an officer.
[6] The motion by JUA was to dismiss for failure to state a claim upon which relief could be granted under R. 4:6-2(e), although it was supported by certifications which included matters outside the pleadings presented to and not excluded by the court. R. 4:6-2. The factual matters in dispute were not material and JUA was entitled to have the complaint dismissed as a matter of law. See R. 4:46-2.