**The RAYMOND PROFFITT FOUNDATION,**

v.

**The UNITED STATES ENVIRONMEN-TAL PROTECTION AGENCY and Carol Browner, Administrator.**

**Civ. A. No. 95–0861.**

United States District Court,
E.D. Pennsylvania.

April 16, 1996.

John W. Wilmer, Media, PA, for The Raymond Proffitt Foundation.

David R. Hoffman, U.S. Attorney's Office, Philadelphia, PA, Mark A. Nitczynski, U.S.

Department of Justice, Washington, DC, for United States Environmental Protection Agency.

Mark A. Nitczynski, U.S. Department of Justice, Washington, DC, Judith R. Hykel, U.S. Attorney's Office, Philadelphia, PA, for Carol Browner.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court are cross motions for summary judgment filed by the plaintiff, The Raymond Proffitt Foundation ("Proffitt"), and the defendants, the United States Environmental Protection Agency ("EPA") and Carol Browner, Administrator (jointly, "Defendants"). For the reasons stated below, the motions will be granted in part and denied in part.

## I. BACKGROUND

This civil action arises out of Defendants' failure to "promptly prepare and publish" a water quality standard for Pennsylvania that complies with the Water Pollution Control Act (the "Clean Water Act" or the "Act"), 33 U.S.C. § 1251 et seq.

### A. The Governing Statutes and Regulations

The Clean Water Act is a comprehensive water quality statute designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act also strives to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a)(2). Essential to these goals are the distinct roles for the federal and state governments. *PUD No. 1 of Jefferson County v. Washington Dep't of Ecology,* 511 U.S. 700, ——, 114 S.Ct. 1900, 1905, 128 L.Ed.2d 716 (1994); *Natural Resources Defense Council v. United States Environmental Protection Agency,* 16 F.3d 1395, 1399 (4th Cir.1993); see 33 U.S.C. § 1251(b). The EPA is charged with establishing and enforcing the states' "technology-based limitations on individual dis-

charges into the country's navigable waters from point sources." *PUD No. 1,* 511 U.S. at ——, 114 S.Ct. at 1905; see 33 U.S.C. §§ 1311, 1314. The Act also requires the states to institute a comprehensive water quality standard setting water quality goals for all intrastate waters. *PUD No. 1,* 511 U.S. at ——, 114 S.Ct. at 1905; 33 U.S.C. §§ 1311(b)(1)(C), 1313. This standard is " 'a supplementary basis . . . so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels.' " *PUD No. 1,* 511 U.S. at ——, 114 S.Ct. at 1905 (quoting *Environmental Protection Agency v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 205 n. 2, 96 S.Ct. 2022, 2025 n. 2, 48 L.Ed.2d 578 (1976)).

In 1972, Congress amended the Act to require all states, if they had not done so already, to adopt a water quality standard that complies with the Act. 33 U.S.C. § 1313(a)(3)(A). A water quality standard defines the water quality goals of a particular body of water by setting forth the uses to be made of the water and the criteria necessary to protect those uses. 40 C.F.R. §§ 130.3, 131.2 (1995). This standard is a "critical component of the Act's regulatory scheme" because its guides state and federal authorities as to whether to grant or deny a particular permit to discharge pollutants into a body of water. See *Natural Resources Defense Council,* 16 F.3d at 1399.

Once a state's water quality standard complies with the Act, it is required, at least once every three years, to hold public hearings to review the standard and decide whether to modify it or adopt a new standard. 33 U.S.C. § 1313(c)(1); 40 C.F.R. § 131.20(a). Each state must submit the results of this review and all supporting information to the EPA. 33 U.S.C. § 1313(c)(1); 40 C.F.R. § 131.20(c). This process is known as the Triennial Review.

The Act and the federal regulations promulgated thereunder set forth six elements that states must include in their water quality standard. See 40 C.F.R. § 131.6. There are three principal elements.[1] First, a state

---

1. The six elements are set forth in 40 C.F.R. § 131.6. In addition to the three principal elements that comprise an antidegradation policy, states must submit the methods used and analysis conducted to support water quality standards

revisions, 40 C.F.R. § 131.6(b), certification that the standards were duly adopted according to law, 40 C.F.R. § 131.6(e), and general information that would help the EPA determine the adequacy of the scientific basis of the standards and

must specify the designated uses of its waters. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.3(f), 131.6(a), 131.10. Second, the state must disclose criteria specifying the amounts of various pollutants that may be present in those waters without impairing the designated uses. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.3(b), 131.6(c), 131.11. Third, the state must submit a statewide antidegradation policy with a standard "sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation." *PUD No. 1*, 511 U.S. at —, 114 S.Ct. at 1906; see 33 U.S.C. § 1313(d)(4)(B); 40 C.F.R. §§ 131.6(d), 131.12.

The third principal element, the antidegradation policy, is the focus of this case. EPA regulations divide the antidegradation policy into three tiers of water quality. See 40 C.F.R. § 131.12. Tier 1 sets forth the minimum standard, under which states must maintain and protect existing water uses and the level of water quality necessary to protect those uses. 40 C.F.R. § 131.12(a)(1). Tier 2 applies to waters whose quality exceeds Tier 1 levels and requires states to maintain and protect the water quality "necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water," unless the state finds that lowering the water quality is "necessary to accommodate important economic or social development in the area." 40 C.F.R. § 131.12(a)(2). Tier 3 applies to high quality waters that constitute outstanding national resources and requires states to maintain and protect the water quality. 40 C.F.R. § 131.12(a)(3). At a minimum, every state must satisfy these conditions; however, a state may promulgate an antidegradation policy that is more stringent than required by the federal regula-

tions. 40 C.F.R. § 131.4(a); *PUD No. 1*, 511 U.S. at —, 114 S.Ct. at 1906.

Once a state has complied with the Act's initial water quality standard, the Act provides two ways in which the EPA enforces the Act and its regulations. First, the EPA may publish a revised water quality standard for a state when "the Administrator determines that a revised or new standard is necessary to meet the requirements" of the Act. 33 U.S.C. § 1313(c)(4)(B). Authority to make such a determination resides with the Administrator. 40 C.F.R. § 131.22(b). The state then must comply with the federally promulgated standard.

Alternatively, a state may submit a new or revised standard to the EPA as part of a Triennial Review. See 33 U.S.C. § 1313(c)(2)(A). If the Regional Administrator[2] approves the revisions, he or she must notify the state of the approval within sixty days. 33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21(a). If the Regional Administrator disapproves the revisions, he or she must notify the state of the disapproval within ninety days.[3] 33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21(b). If the state fails to adopt the changes specified by the Regional Administrator within ninety days of the notice of disapproval, "the Administrator shall promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved." 33 U.S.C. § 1313(c)(4); see also 40 C.F.R. § 131.22(a) (requiring the Administrator to "promptly propose and promulgate" the changes specified by the Regional Administrator in its disapproval notice). The state is required to comply with the Administrator's new federal regulations setting forth a new water quality standard.

that discloses general policies applicable to state standards that may affect their application and implementation, 40 C.F.R. § 131.6(f).

**2.** The EPA has divided the United States into 10 regions. 40 C.F.R. § 1.5. Pennsylvania is part of Region III. Each region has a Regional Administrator, who reports to the Administrator and is responsible for, among other things, "[e]xercising approval authority for proposed State standards and implementation programs." 40 C.F.R. § 1.61. Regional Administrators are dele-

gated the power to approve or disapprove state water quality standards. 40 C.F.R. § 131.21. Therefore, the duties that § 1313(c) imposes on the Administrator will be performed by the Regional Administrator.

**3.** A notice of disapproval must specify the changes needed to assure compliance with the Act and must explain why the state standard fails to comply with the Act's requirements. 40 C.F.R. § 131.21(a)(2).

## B. The Factual and Procedural History

The material facts of this case are not in dispute. On September 2, 1971, Pennsylvania first adopted a water quality standard, including an antidegradation policy. (Defs.' Mem.Supp.Summ. J. at 8.) On August 10, 1973, the EPA approved the standard. Id. In 1979 and 1985, Pennsylvania completed Triennial Reviews of its water quality. Id. Between 1989 and 1994, the EPA continually notified Pennsylvania that its review was deficient in part because its antidegradation policy failed to comply with the federal standard. (Pl.'s Mem.Supp.Summ. J. at 3.) Pennsylvania's Department of Environmental Resources[4] submitted its 1992 Triennial Review on March 9, 1994. (Ex. D–3.)[5] On June 6, 1994, the EPA disapproved certain provisions of the standard, including the antidegradation policy.[6] (Ex. P–1.) The EPA found that Pennsylvania's policy failed to comply with federal regulations governing Tier 1, Tier 2, and Tier 3 waters. Id.

As to Tier 1 waters, the EPA approved Pennsylvania's adoption of a definition of existing uses that mirrors the federal definition. Id. at 3. However, the EPA found that Pennsylvania's policy varied from the federal standard because it linked existing use protection to DER's rulemaking process. Id. The EPA reasoned that the Pennsylvania standard might not protect existing uses if DER determined that the waterbody attains the criteria for an existing use that is more protective for the waterbody than the designated use. Id. The EPA thus concluded that this state standard was not consistent with the federal regulation requiring Tier 1 water uses to be "maintained and protected." Id. at 3–4; see 40 C.F.R. § 131.12(a)(1). The EPA requested that Pennsylvania insert the "maintained and protected" language in its Tier 1 antidegradation policy. (Ex. P–1 at 3–4.)

As to Tier 2 waters, Pennsylvania developed a Special Protection Program designating Tier 2 waters as High Quality. Id. at 4. The EPA found that this program "provides an excellent vehicle to protect valuable waters in the Commonwealth," mainly because it does not allow de minimis deposits to be exempted from the antidegradation process. Id. However, because Pennsylvania designates High Quality waters as those having "excellent quality waters and environmental or other features that require special water quality criteria," the EPA concluded that Pennsylvania's policy does not cover waters that would be protected under federal Tier 2 protection. Id. (emphasis added). The EPA noted that Pennsylvania denied High Quality protection to waters that had excellent quality but lacked other environmental or other features. Id. Concluding that Pennsylvania's program fails to "provide for special protection where data are absent, potentially denying protection to high quality waters because of resource limitations or lack of petitions," the EPA stated that the policy would meet the federal standard if the state dropped the "environmental or other feature" requirement in the High Quality definition or added a new, less exclusive category in the Special Protection Program. Id. at 4–5.

As to Tier 3 waters, Pennsylvania's Special Protection Program created the Exceptional Value designation, which the EPA characterized as "broader" than the federal Tier 3 standard. Id. However, the EPA noted that these Exceptional Value waters are protected at their existing water quality as long as "no adverse measurable change" in existing quality would occur as a result of a point source permit. Id. The EPA concluded that

---

**4.** On July 1, 1995, DER was divided into two agencies. The successor agency for environmental regulations, including all water quality standards, is the Pennsylvania Department of Environmental Protection. For purposes of this memorandum, the court will refer to the agency solely as "DER."

**5.** All citations to "Ex." refer to exhibits submitted as part of the parties' summary judgment motions. In this memorandum, Proffitt's exhib-

its will be designated with a "P" prefix, while Defendants' exhibits will be designated with a "D" prefix. Citations to Defendants' exhibits that are part of the administrative record will refer to the exhibit's tab number.

**6.** The EPA also disapproved the state's aluminum criterion and the use of ambient concentrations to adjust criteria for the modification of effluent limits. (Ex. P–1 at 1).

this standard was inconsistent with an EPA policy forbidding all long-term new or expanded discharges in Tier 3 waters because Pennsylvania's policy "could allow potentially significant discharges and loading increases from point and nonpoint sources." Id. The EPA asked Pennsylvania to amend its regulations to create, in addition to the Exceptional Value category, a new level of Tier 3 protection for Outstanding Natural Resource Waters to which no new or expanded discharges would be allowed. Id. at 6.

On September 2, 1994, the DER responded to the EPA's partial disapproval of the Triennial Review. (Ex. P–2.) As to Tier 1, the DER stated that it believed its regulations are not only "substantially equivalent" to the federal Tier 1 standard, but actually preferable to it, because the state process contains technical data and public participation requirements. Id. at 4. As to Tier 2, the DER said it was willing to reassess its position on defining High Quality waters, but that "the most effective and productive means to address the Tier 2 issue is to provide the opportunity for public review and discussion of the alternatives prior to proposing regulatory changes." Id. at 4–5. Regarding Tier 3, the DER stated that the EPA lacks the legal authority to compel it to create the Outstanding Natural Resource Waters category and threatened to "challenge any further EPA action on this issue in the federal courts." Id. at 6.

On October 5, 1994, the EPA responded to the DER's letter. (Ex. P–3.) On Tier 1, the EPA affirmed its previous evaluation, but said it was willing to explore alternatives to rulemaking. Id. at 3. On Tier 2, the EPA agreed with the DER's plan to reassess its position on defining its High Quality program and encouraged Pennsylvania to act as quickly as possible. Id. On Tier 3, the EPA acknowledged that its policy forbidding "no new or expanded discharges" is not in the Act or EPA regulations, but was based on EPA guidance. Id. at 4. Nevertheless, the EPA said it would follow the policy because it "is good public policy and good environmental sense that we protect waters that qualify as outstanding national resources to the fullest extent possible." Id.

On December 10, 1994, the DER scheduled two public hearings to discuss Pennsylvania's surface water antidegradation program in general, and Tier 2 specifically. 24 Pa.Bull. 6184 (Dec. 10, 1994); (Ex. D–37). The hearings were held on January 11, 1995, and were attended by state and federal regulators, industry representatives, and environmental groups. (Ex. D–39.)

On March 16, 1995, the DER informed the EPA that it had scheduled a public hearing for April 20, 1995, to receive formal comments on the current antidegradation program and recommendations for changes. (Ex. D–46.) After this hearing, the DER stated, it planned to

> utilize public and internal input to develop a report on program issues and outline a range of options for change. At that point, we plan to initiate focused, facilitated
>
> discussions with representatives of the regulated community, the environmental community, and general public interest groups. These structured discussions will be facilitated by a professional environmental mediator and will be designed to generate consensus on program modifications that will be incorporated into water quality standards rulemaking.

Id. at 1. This consensus-building approach to revising Pennsylvania's water quality standard is called a regulatory-negotiation, or "reg-neg," process.

On March 23, 1995, the EPA issued its Final Water Quality Guidance for the Great Lakes System. 60 Fed.Reg. 15,366 (to be codified in various parts of 40 C.F.R.); Ex. D–48. These regulations include minimum water quality criteria, antidegradation policies and implementation procedures for the Great Lakes Region, which includes some waters in Pennsylvania. Id. Pennsylvania must adopt equivalent language applicable to the few state rivers that drain into the Great Lakes by March 23, 1997. Id.

On May 3, 1995, the United States Fish & Wildlife Service (the "Service"), following the EPA's position, informed the DER that it should do the following to bring Pennsylvania's water quality standard into compliance with federal law: (1) conform to federal Tier

1 protection by changing its regulations to allow for full protection of existing uses and the water quality needed to maintain those uses; (2) afford Tier 2 protection to non-High Quality streams where water quality is good by dropping the need for an "environmental feature"; and (3) demonstrate that the Exceptional Value category does indeed mean "no degradation," and therefore is the equivalent of Tier 3. (Ex. D–56 at 8.)

On May 18, 1995, the DER told the EPA that its reg-neg process is designed to review all policy and regulatory aspects of Pennsylvania's antidegradation program, including issues that were not directly related to the EPA's disapproval of Pennsylvania's program. (Ex. D–58.) On June 1, 1995, the DER stated that it would hold its first meeting in the twelve-week process on June 27, 1995, and that the negotiations would conclude near the end of September 1995. (Ex. P–10 at 1.) Within a month after the hearings concluded, the participants would draft the proposed regulatory changes. Id. The DER then described the statutory state regulatory review process that would be necessary to enact the proposals into law:

> Under current law, the [DER]'s proposed regulations are reviewed and approved by the Environmental Quality Board as proposed rulemaking, published in the PA Bulletin for public comment, revised if necessary, and presented to the Environmental Quality Board for adoption as final rulemaking. The proposed and final regulations are also subject to review by the state Independent Regulatory Review Commission, standing environmental committees in the PA General Assembly, the Governor's Office of General Counsel and the Attorney General. The revised regulations become effective upon publication as final rulemaking in the PA Bulletin. The average time needed to complete this process is eighteen months. We are optimistic that the "reg-neg" efforts will allow this regulatory review process to flow smoothly for these regulatory revisions.

We are committed to expedite the process where we can.

(Ex. D–59 at 1–2.) The DER retained the services of a Colorado company to facilitate the reg-neg process. (MacKnight Decl. ¶ 8.)[7] The reg-neg group held its first two meetings on June 27 and July 10, 1995, and invited more than twenty organizations representing environmental, business and civic interests to participate. (Id. ¶¶ 8–11; Exs. D–63, D–64.) The reg-neg participants agreed to focus on developing remedies for the three tiers of Pennsylvania's antidegradation policy. Id. ¶ 11. On July 14, 1995, State officials stated that the reg-neg process would conclude in March 1996. (Ex. P–11 at 2). As of this date, Pennsylvania has not adopted a water quality standard that complies with federal law.

Meanwhile, the EPA has not even started working on the two primary documents that it must prepare to promulgate a water quality standard for a state: the draft Federal Register package and the final action memo. (Morris Dep. at 26; MacKnight Dep. at 36.) The draft Federal Register package generally contains documents that are necessary to "bring the Pennsylvania water quality standards in line with federal regulations." (Morris Dep. at 25.) The final action memo, signed by the Regional Administrator, recommends promulgation of the standard and is forwarded to the Administrator for approval. Id. The EPA plans to prepare the draft Federal Register package when the results of Pennsylvania's reg-neg process are complete. (Morris Dep. at 27.) Region III has not yet received authority from the Administrator to move forward with the promulgation process. (MacKnight Dep. at 41.) The EPA believes that Pennsylvania is "honestly and professionally pursuing the regulation review and development procedure and that this is not a sham." (Morris Dep. at 50.) The EPA is

> watching to see what Pennsylvania is doing while we try to support their efforts as

---

**7.** Citations to "MacKnight Decl." and "MacKnight Dep." refer, respectively, to the declaration and deposition of Evelyn S. MacKnight ("MacKnight"), the manager in charge of water quality standards at Region III's Water Quality Stan-

dards Program. (MacKnight Dep. at 5.) She is the EPA official primarily responsible for communicating with DER on the issues that are the subject of this civil action. Id. at 54.

much as possible to make sure they have adequate support in their own promulgation process and at the same time, we are also collecting information and preparing our position to promulgate should Pennsylvania fail to do so.

(MacKnight Dep. at 48.)

The EPA contends that promulgating a water quality standard for Pennsylvania would require "significant resources" because it would divert resources from other enforcement activities that are likely to have greater environmental consequences.[8] (MacKnight Decl. ¶ 16.) Further, the EPA asserts that the consequences of the EPA's delay in promulgating a Pennsylvania antidegradation policy are "not significant." Id. ¶ 15. This is so because the state protects twenty-five percent of its waters as High Quality and three percent as Exceptional Quality and, thus, the only waters that do not comply with the Clean Water Act are those that were not so designated. Id.

On December 12, 1994, Proffitt[9] gave notice to Defendants, to the DER, and the United States Attorney General, of its intent to sue under the Act. Count I of Proffitt's Complaint, filed pursuant to the citizen-suit provision of the Act, 33 U.S.C. § 1365(a)(2), requests the court to compel the EPA to promptly prepare and publish an antidegradation policy for Pennsylvania that is consistent with the minimum requirements of 40 C.F.R. § 131.12. Proffitt states that Defendants' failure to do so is a violation of their nondiscretionary duty under 33 U.S.C. § 1313(c)(4)(A). Count II seeks the same relief, but alleges that Defendants violated their nondiscretionary duty under 33 U.S.C. § 1313(c)(4)(B). Counts III, IV, and V seek recovery under provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Count VI does not state an independent cause of action, but requests that the court order EPA to obey the requirements of § 1313(c)(4).

On August 3, 1995, Defendants filed a Motion for Summary Judgment on all six counts. Four days later, Proffitt filed a summary judgment motion on Counts I, III, IV, and VI. Each party has filed responsive papers and submitted documents, depositions, and other supporting evidence. The court, having reviewed all of the arguments, evidence, and relevant case law, will grant Proffitt's motion on Counts I, III, and IV, and deny Defendant's motion on Counts I–V. As to Count VI, the court will partly grant and partly deny each party's motion.

The court will order Defendants, immediately and without further delay, "to prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved."

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

8. David K. Sabock, Chief of the Water Quality Standards Branch, Standards and Applied Science Division, Office of Science and Technology ("OST"), in the EPA's Office of Water, has stated that the following steps would normally be undertaken to promulgate a federal water quality standard: (1) complete a Tiering request form; (2) draft a proposed rule and preamble for review and comment by an ad hoc work group; (3) prepare a communications strategy; (4) determine whether the water quality standard would be "significant" under Executive Order 12866 and, if so, conduct a Regulatory Impact Analysis; (5) prepare a Federal Register print request; (6) prepare an Information Collection Request; (7) prepare a review memo with a recommendation for action from OST to the Assistant Administrator for Water; (8) prepare an action memo from the Regional Administrator to the Administrator requesting signature on rule; (9) conduct internal briefings as needed; (10) conduct OMB briefings as needed; (11) present the rule to the Administrator for signature; (12) conduct a public hearing on the proposed rule; (13) consult with the Service under the Endangered Species Act as appropriate; (14) work group reviews public comments and prepare responses; and (15) repeat steps (2) through (11) for final rule. (Sabock Decl. ¶ 1–2.) This process is likely to take between 18 and 24 months. Id. ¶ 3. MacKnight stated that it would take one person longer than a year's worth of time to promulgate water quality standards for Pennsylvania. (MacKnight Dep. at 61.)

9. Proffitt is a non-profit foundation based in Media, Pennsylvania, that represents persons who have suffered adverse effects related to their environmental, recreational, and aesthetic uses of Pennsylvania waters. (Compl. ¶¶ 7–8.)

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Whether a genuine issue of material fact is presented will be determined by asking if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the non-moving party has the burden to produce evidence to establish prima facie each element of its claim or defense. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Such evidence and all justifiable inferences that can be drawn from it are to be taken as true. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. However, if the non-moving party fails to establish an essential element of its claim, the moving party is entitled to a judgment dismissing that claim as a matter of law. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

■ The standards by which a court decides a summary judgment motion do not change when the parties file cross motions. *Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n,* 826 F.Supp. 1506, 1512 (E.D.Pa.1993), aff'd, 27 F.3d 558 (3d Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 318, 130 L.Ed.2d 279 (1994). When ruling on cross motions for summary judgment, the court must consider the motions independently, *Williams v. Philadelphia Hous. Auth.,* 834 F.Supp. 794, 797 (E.D.Pa.1993), aff'd 27 F.3d 560 (3d Cir.1994), and view the evidence in each motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### III. PROFFITT'S CITIZEN–SUIT CLAIMS

#### A. Whether § 1313(c)(4) Imposes a Mandatory Duty

■ Under the citizen-suit provision of the Act, "any citizen may commence a civil action on his own behalf . . . against the Adminis-trator where there is an alleged failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). Therefore, this court has subject-matter jurisdiction over Proffitt's citizen-suit claim only if it alleges that the Administrator failed to perform a mandatory duty. Proffitt cites two subparagraphs of 33 U.S.C. § 1313(c) as setting forth such a nondiscretionary duty of the Administrator. The provisions state, in pertinent part:

(3) . . . If the Administrator determines that any such revised or new standard is not consistent with the applicable requirements of this chapter, he shall not later than the ninetieth day after the date after the submission of such standard notify the State and specify the changes to meet such requirements. If such changes are not adopted by the State within ninety days after the date of notification, the Administrator shall promulgate such standard pursuant to paragraph (4) of this subsection.

(4) The Administrator shall promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved—

(A) if a revised or new water quality standard submitted by such State under paragraph (3) of this subsection for such waters is determined by the Administrator not to be consistent with the applicable requirements of this chapter, or

(B) in any case where the Administrator determines that a revised or new standard is necessary to meet the requirements of this chapter. The Administrator shall promulgate any revised or new standard under this paragraph not later than ninety days after he publishes such proposed standards, unless prior to such promulgation, such State has adopted a revised or new water quality standard which the Administrator determines to be in accordance with this chapter.

33 U.S.C. § 1313(c)(3), (4). Thus, the first question the court must decide is whether § 1313(c)(3) imposes a mandatory duty on the Administrator to "promptly prepare and publish proposed regulations setting forth a

revised or new water quality standard" for Pennsylvania.

■ When interpreting a statute, the United States Supreme Court and the United States Court of Appeals for the Third Circuit have repeatedly stated that a court should first look to the plain meaning of the statutory language. *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 1575–76, 108 L.Ed.2d 842 (1990); *Spellman v. Meridian Bank,* No. 94–3203, 1995 WL 764548, at *14 (3d Cir. Dec. 29, 1995); *In re TMI,* 67 F.3d 1119, 1123 (3d Cir.1995); *Resolution Trust Corp. v. Cityfed Fin. Corp.,* 57 F.3d 1231, 1237 (3d Cir.1995). In determining the meaning of the statutory language, the court also must look to the language and design of the statute as a whole. *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991); *K mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988).

Further, both the Supreme Court and the Third Circuit often have stated that the use of the word "shall" in statutory language means that the relevant person or entity is under a mandatory duty. *United States v. Monsanto,* 491 U.S. 600, 607, 109 S.Ct. 2657, 2662, 105 L.Ed.2d 512 (1989) (By using "shall" in a civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied...."); *Pierce v. Underwood,* 487 U.S. 552, 569–70, 108 S.Ct. 2541, 2552–53, 101 L.Ed.2d 490 (1988) (noting that Congress's use of "shall" in a statute was "mandatory language"); *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 739 n. 15, 101 S.Ct. 1437, 1444 n. 15, 67 L.Ed.2d 641 (1981) (same); *United States v. Martinez–Zayas,* 857 F.2d 122, 128 (3d Cir.1988) (stating that Congress clearly and unambiguously expressed its intent by stating that the court "shall" impose a mandatory sentence and that this created a mandatory legal duty to impose the sentence); *United States v. Troup,* 821 F.2d 194, 198 (3d Cir.1987) (stating that Congress's use of the word "shall" was "mandatory"); see also United States ex rel. *Senk v. Brierley,* 471 F.2d 657, 659–60 (3d Cir.1973). There-

fore, the court will construe Congress's use of "shall" in § 1313(c)(3) as imposing a mandatory, nondiscretionary duty on the Administrator. Accord *Idaho Conservation League, Inc. v. Russell,* 946 F.2d 717, 720 (9th Cir.1991) ("There is no case law suggesting [§ 1313(c) ] leaves the Administrator any discretion to deviate from this apparently mandatory course.").

The language and design of the Clean Water Act as a whole supports the court's conclusion that the duty imposed on the Administrator under § 1313(c)(4) is nondiscretionary. First, among the purposes of the Act are to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a)(1), (2). These congressional goals simply cannot be satisfied when neither the EPA nor the state has promulgated a water quality standard that complies with federal law. This is so because discharges that would be unacceptable under federal law are presently being allowed under the less stringent Pennsylvania rules.

Second, § 1313(c)'s procedure for approval of a state water quality standard is persuasive evidence that Congress provided for the situation in which the Administrator had rejected the state's water quality standard and the state was then unwilling or unable to promulgate standards that complied with the Act. In this situation, Congress has stated that the Administrator—and nobody else— must promptly prepare and promulgate an acceptable water quality standard. Congress could have solved this problem by permitting the Administrator, in her discretion, to either prepare the regulations or permit a state reg-neg process to do so. But Congress placed the burden on the Administrator to achieve the goals of the Act.

Despite the court's findings that the plain meaning and language and design of § 1313 lead to the conclusion that the section imposes a mandatory duty on the Administrator, the court must hold to the contrary if this is one of those "rare and exceptional circumstances" in which there is a "clearly expressed legislative intention" that the duty

imposed by the statute is nondiscretionary. *Martinez–Zayas*, 857 F.2d at 129 (internal quotations omitted). Defendants have cited case law and provisions of the legislative history emphasizing that the states are to have the primary role in developing water quality standards. The court agrees that Congress has placed primary responsibility to comply with the Act with the states, but this fact does not change the court's conclusion as to the meaning of the Administrator's duty in § 1313(c).

The Act, and § 1313 in particular, sets forth state and federal responsibilities concerning promulgation of a water quality standard. Nothing in § 1313 prevents Pennsylvania from engaging in a comprehensive review of its antidegradation program. Indeed, the state's evaluation of its water quality standard through a reg-neg process will educate interested parties as to the Act's requirements and enable Pennsylvania to submit a more informed Triennial Review package. However, the fact that Pennsylvania has opted to undertake this consensus-building approach can not trump Congress's clear mandate that the EPA promptly prepare· and publish a water quality standard for the state if the EPA has disapproved the state's standard. Once the EPA has disapproved the state standard, the ball is in the EPA's court. Nothing in the Act authorizes the EPA to defer to the state or put off its obligation to proceed to fulfill its mandatory duty until the state promulgation process is finished. To conclude otherwise is to allow the Administrator to abdicate the will of the Congress to the timetable of a state. Pennsylvania's ongoing reg-neg process is on a separate track and it may or may not succeed in conforming to the national requirements. Whatever the state's program is, and no matter how well-meaning its reg-neg procedure is concerning the time and course it is expected to take, it is neither an exemption nor an excuse to forestall the EPA in carrying out its § 1313(c) duty.

The court notes that another district court has held that § 1313(c)(4) does not impose a mandatory duty on the Administrator. See Defenders of *Wildlife v. Browner*, 888 F.Supp. 1005, 1008–09 (D.Ariz.1995). That court chose to follow the rule that, for citizen-suit purposes under the Clean Water Act, a nondiscretionary duty is imposed only when the statutory provision sets bright-line, date-specific deadlines for specified action. This court will not follow this rule for three reasons. First, the rule originally was developed to resolve an issue under the bifurcated jurisdictional scheme of the Clean Air Act, and there is no analogous problem under the Clean Water Act. Second, applying the rule to the facts of this case would lead to a result that is inconsistent with the Clean Water Act's goals and § 1313(c)'s procedural framework. Third, the Third Circuit has neither adopted nor followed the rule and, therefore, it does not bind this court.

### 1. The Development of the "Date–Certain" Deadline Rule

The birth of the rule can be traced to *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692 (D.C.Cir.1974). In that case, the plaintiff claimed, under the Clean Water Act's citizen-suit provision, that the EPA Administrator had failed to comply with 33 U.S.C. § 1314(b)(1)(A), which requires publication, "within one year of October 18, 1972," of regulations providing guidelines for effluent limitations. Id. at 704. The regulations required the Administrator to identify the degree of effluent reduction attainable through the best methods currently available for classes and categories of point sources. Id. The district court held that the statute imposed a mandatory "duty to publish within one year of enactment of the Act final ... effluent limitation guidelines necessary to provide comprehensive coverage of all point source discharges." Id. (internal quotation and footnote omitted) (emphasis added). The Administrator argued to the District of Columbia Circuit that the district court erred by holding that this nondiscretionary duty applied to point source discharges within the categories stated in § 1316 ("Class I sources") as well as to those outside that section ("Class II sources"). Id.

The Court of Appeals, relying on the Act's legislative history and deferring to the EPA's interpretation of the statute, agreed with the Administrator and held that the mandatory

duty imposed by § 1314 applied only to Class I sources. Id. at 705. The court, however, did not decide whether "the general duty to publish effluent guidelines for [Class II] source categories by December 31, 1974, comes within the nondiscretionary duties covered by [the Act's citizen-suit provision] or is more appropriately subject to court challenge under the Administrative Procedure Act as an abuse of discretion or an agency action unreasonably delayed." Id. at 714.

The District of Columbia Circuit further developed the rule in *Sierra Club v. Thomas*, 828 F.2d 783 (D.C.Cir.1987). In this case, the plaintiff filed complaints in the district court and the court of appeals, asking the courts to compel the EPA to conclude its rulemaking concerning whether to place strip mines on its list of pollutant sources subject to fugitive emissions regulated under the Clean Air Act. Id. at 784. The plaintiff alleged that the EPA unreasonably delayed in concluding the rulemaking. Filing the complaint in both courts was possible because the Clean Air Act's citizen-suit provision permits a person to sue to compel agency action unreasonably delayed in the district court. 42 U.S.C. § 7604(a). The statute also provides that "a petition for review of ... any other nationally applicable regulations promulgated, or final action taken, by the Administrator may be filed only in the United States Court of Appeals for the District of Columbia." 42 U.S.C. § 7607(b)(1). The district court had review of discretionary duties of timeliness, while the court of appeals reviewed nondiscretionary duties of timeliness. *Sierra Club*, 828 F.2d at 790.

The Court of Appeals was faced with the issue left undecided by Train, that is, whether allegations of unreasonable delay under the Clean Air Act could be filed in the district court, the court of appeals, or in both courts, when the plaintiff sought to enforce a duty of timeliness that was not readily ascertainable, but was the product of inferences based upon the overall statutory scheme. *Sierra Club*, 828 F.2d at 791. The *Sierra Club* court held that duties of timeliness based on such inferences give rise to a general, discretionary duty that "requires assessment of both the need for 'quality' in the

agency's actions and the 'burden' that compliance with the deadline would impose upon the agency." Id. at 792. The District of Columbia Circuit believed it was better suited to handle such claims. On the other hand, the court found that the district court was better suited to resolve alleged violations of duties of readily ascertainable deadlines.

The Second Circuit has cited *Sierra Club* for the idea that " 'the District of Columbia Circuit has distinguished between those revision provisions in the [Clean Air] Act that include stated deadlines and those that do not, holding that revision provisions that do include stated deadlines should, as a rule, be construed as creating non-discretionary duties.' " *Natural Resources Defense Council, Inc. v. Thomas*, 885 F.2d 1067, 1075 (2d Cir.1989) (quoting *Environmental Defense Fund v. Thomas*, 870 F.2d 892, 897 (2d Cir.), cert. denied, 493 U.S. 991, 110 S.Ct. 537, 107 L.Ed.2d 535 (1989)).

2. Section 1313(c)(4)'s "Inferrable Deadline"

The court notes that § 1313(c)(4) states that the Administrator "shall promptly" prepare and publish a water quality standard. The court also notes that this is not a "bright-line" or "date-certain" deadline that would create a nondiscretionary duty under the *Train* and *Sierra Club* cases. However, the framework of § 1313 enables this court to infer a reasonable time frame within which the Administrator must act. The statute sets forth a rigid, time-specific schedule requiring the Administrator to approve a state's revised water quality standard within sixty days or to reject it within ninety days. If the state does not adopt the changes within ninety days, the statute requires that the Administrator "shall promptly prepare and publish proposed regulations." Given these relatively rapid submission-and-approval deadlines, the court believes that Congress unquestionably intended the Administrator to prepare and publish regulations to fit comfortably within this calendar from the viewpoint of competence and administrative capacity.

The court does not know exactly what Congress meant by "promptly." However,

the court must, if possible, construe the statute in such a fashion that every word has some operative effect. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 1015–16, 117 L.Ed.2d 181 (1992); *United States v. Ohio Barge Lines, Inc.*, 607 F.2d 624, 630 (3d Cir.1979) (stating that courts should "avoid reading the terms of a statute as mere surplusage in the absence of some proof that they were so intended"). By using the word "promptly," Congress expected the Administrator to begin preparing and publishing the regulations without undue delay. Action within ten days is plainly an unreasonably short time. On the other hand, one or two years is clearly too long when matched with the section's stated deadlines and the provisions for review of a state's standard every three years. Congress likely intended that the Administrator fulfill this mandatory duty sometime within this schedule, and not the 588 days (and still counting) that the Administrator has taken in this case.

This 588–day time frame is unreasonable because Congress likely expected that the EPA's regional staff and state regulatory officials would be working together on the water quality standard and that the EPA would be familiar with the state standard because it is submitted as part of a Triennial Review. Congress surely understood that the EPA would not need to start from "square one" as it promulgates Pennsylvania's antidegradation policy. In this case, the EPA has been in unbroken consultation with state officials, participated in state hearings on the policy, and has stated, in detail, exactly why it disapproved Pennsylvania's policy and, with precision, exactly what Pennsylvania needs to do to comply with federal law. The EPA cannot now realistically assert that it is unprepared to begin to prepare and publish a water quality standard for Pennsylvania from whole cloth.

### 3. The Rule's Awkward Fit in this Context

The court believes that the rule of Sierra Club was developed in the context of a statutory jurisdictional framework that fits, at best, awkwardly with the facts of this case. The court believes that an "inferrable deadline," such as the one in this case, gives rise to the same nondiscretionary duty—albeit, somewhat more of a moving target—than a "date-certain" or "bright-line" deadline imposes. It is surely not a "general duty" that cannot be enforced by a citizen suit under the Clean Water Act. The single reason that the *Sierra Club* created the two categories of statutory deadlines was to divide subject-matter jurisdiction over allegations of unreasonable delay under the Clean Air Act. Violations of "inferrable deadlines" were designated to the District of Columbia Circuit because that court believed it had the expertise to evaluate the quality or burdens that compliance would impose on an agency. *Sierra Club*, 828 F.2d at 792. Violations of "date-certain" deadlines were designated to the district courts because those courts are better suited to determine the factual issue of whether a violation occurred. Id.

This court understands this sensible approach to apportioning jurisdiction of these Clean Air Act claims, but also believes that it does not apply to the Clean Water Act because citizen suits alleging unreasonable delay under § 1313 can be brought only in the district court under 33 U.S.C. § 1365(a)(2). The court notes that the Clean Water Act grants exclusive jurisdiction to the Court of Appeals in several narrow classes of cases, but none of these involve the rejection or approval of a state water quality standard such as that before the court.[10]

The *Sierra Club* court fashioned its rule as part of an attempt to distinguish between the two court-bound avenues by which a citizen may travel to file a suit alleging unreasonable delay under the Clean Air Act. There is no reason to transport the *Sierra Club* rule into the much different context of a citizen's suit claim alleging violation of a nondiscretionary duty under § 1313 of the Clean Water Act.

**10.** See 33 U.S.C. §§ 1319(g)(8) (providing for judicial review of certain civil penalties imposed under § 1319, covering violations of permit conditions and limitations, exclusively in the Court of Appeals); 1321(b)(6)(G) (same rule for civil penalties imposed under § 1321, covering oil and hazardous substance liability); 1369(b)(1) (same rule for six narrow categories of cases dealing with effluent limitations).

This court believes that allegations of violations of all mandatory duties, including violations of duties of timeliness based on readily ascertainable inferences, may be the subject of a citizen-suit under § 1365(a)(2).

#### 4. The *Sierra Club* Rule Does Not Bind This Court

The rule that, for citizen-suit purposes under the Clean Water Act, a nondiscretionary duty is imposed only when the statutory provision sets bright-line, date-specific deadlines for specified action, as developed by the District of Columbia Circuit in a Clean Air Act case and has been followed by some other courts, including the Second Circuit. The Third Circuit has neither adopted nor followed this rule, and this court believes its application to the facts of this case is inappropriate. The court will decline to follow *Sierra Club v. Thomas, Environmental Defense Fund v. Thomas,* and *Defenders of Wildlife v. Browner.*

### B. Whether the Administrator Failed to Perform the Mandatory Duty

■ Having determined that the Administrator's duty under 33 U.S.C. § 1313(c)(4) is nondiscretionary, the next issue is whether the Administrator has fulfilled her duty. On March 9, 1994, Pennsylvania submitted its water quality standard to the EPA. Because the Administrator determined that Pennsylvania's revised water quality standard was not consistent with the requirements of the Act, she had ninety days to so notify the State and specify the changes to meet such requirements. The Regional Administrator did this on June 6, 1994. Therefore, if Pennsylvania did not adopt the changes within ninety days of June 6, the Regional Administrator was required to promulgate such standard pursuant to paragraph (4) of this subsection. It is clear that, as of September 6, 1994, the Administrator was under a mandatory statutory duty to "promptly" promulgate a water quality standard for Pennsylvania pursuant to 33 U.S.C. § 1313(c)(4).

For nineteen months, since the EPA disapproved Pennsylvania's antidegradation policy, discharges into the state's waters have been allowed under standards that fall short of the Clean Water Act's strictures. To repeat, section 1313(c) requires the Administrator to approve a state's revised water quality standard within sixty days or to reject it within ninety days. Again, if the state does not adopt the changes within ninety days, the statute says, the Administrator "shall promptly prepare and publish proposed regulations." Considering these deadlines as a guide to congressional intent, the court concludes that a nineteen-month delay in preparing and publishing proposed regulations is not fulfilling a public duty "promptly," as commanded by the Congress in the context of the subject matter before the court.

For purposes of Proffitt's motion, the court must view the evidence in the light most favorable to Defendants. However, the court has difficulty in accepting the notion that assembling the relevant documents, developing an agency position, composing a draft federal register package, writing a final action memo, and finishing the promulgation process is the monumental, two-year project that Defendants claim it is. Two years could be necessary in other circumstances (for example, if the EPA were totally unfamiliar with the state's proposal and had no idea of what the state needed to do to comply with federal law), but that is not the case here. Region III's own research position shows that it has all of the information it needs to move forward with its part in the promulgation process.[11] The EPA has assembled an administrative record and submitted it to the court as part of this motion. The agency developed its position when it decided to disapprove the Pennsylvania standard and engaged in a dialogue with the DER about why its antidegradation policy was incompatible with the Act. The EPA now must proceed to promulgate a federal regulation setting forth a water quality standard for Pennsylvania. That is its duty!

---

**11.** Indeed, Defendants furnished the court with a three-volume Administrative Record that comprises 67 exhibits and at least 300 pages. Several documents discuss, in specific detail, the reasons for disapproving Pennsylvania's standard and the steps necessary to comply with the Act. (See, e.g., Exs. D–10, D–13, D–15, D–16, D–26, D–31.)

The time has come for the EPA to do what Congress has mandated. The EPA must begin to prepare and publish a water quality standard for Pennsylvania now.

For these reasons, the court will grant Proffitt's motion on Count I and deny Defendants' motion on Counts I and II.

## IV. PROFFITT'S APA CLAIMS

Proffitt also asserts three claims under the APA, 5 U.S.C. §§ 701–706. Count III alleges, pursuant to 5 U.S.C. § 706(1), that the EPA's refusal or failure to perform its § 1313(c) duty is agency action unlawfully withheld or unreasonably delayed. Count IV alleges, under 5 U.S.C. § 706(2)(A), that the EPA's refusal or failure to perform the duty is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Count V alleges, pursuant to 5 U.S.C. § 706(2)(B), that the EPA's failure to promptly prepare and publish proposed regulations is contrary to constitutional right, power, privilege, or immunity. Defendants have moved for summary judgment on all counts. Proffitt's summary judgment motion concerns Counts III and IV.

A court's review of agency action is limited to the full administrative record that was before the agency at the time it made its decision. 5 U.S.C. § 706; see *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985). The court may remand the case to the agency if the record does not support the agency action or if the record is inadequate. 2 Federal Procedure § 2:385, at 363 (1994). In addition, the court may look outside the record (1) when the documents in question are necessary to explain the agency's action; (2) to understand an otherwise inexplicable administrative action; and (3) to explain an unclear or technical record. Id. § 2:383, at 362. The administrative record submitted by Defendants does not answer all the court's questions about why it has not promulgated a water quality standard for Pennsylvania. However, despite the few informational gaps in the record, the court believes that it can, from the record as a whole, discern the basis for Defendants' decision not to propose and publish a water quality standard for Pennsyl-

vania, but rather to permit the state to engage in a reg-neg process that might or might not culminate in promulgation of a standard that complies with the Act. For this reason, the court will not consider the depositions and declarations of the parties in deciding Proffitt's APA claims.

### A. Claim Under 5 U.S.C. § 706(1)

The APA empowers a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The parties agree that unreasonable delay is measured by the factors set forth in *In re International Chemical Workers Union*, 958 F.2d 1144 (D.C.Cir.1992) (per curiam). First, the court should ascertain the length of time that has elapsed since the agency came under a duty to act. Id. at 1149. Second, the reasonableness of the delay should be judged in the context of the statute authorizing the agency's action. Id. Third, the court should assess the consequences of the agency's delay. Id. Fourth, the court should consider "any plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." Id.

The court discussed the first two factors at length in Part III of this Memorandum. The court observed that nineteen months have elapsed since the EPA came under a duty to prepare and publish a new or revised water quality standard for Pennsylvania. The court also explained that the delay was unreasonable, considering § 1313(c)'s sixty- and ninety-day deadlines and the procedure for reviewing a state's standard every three years.

As to the third factor, the consequences of the agency's delay, the court believes that the environmental effects of Defendants' delay in complying with its § 1313(c) duty are significant. The administrative record reveals that the EPA has concluded that Pennsylvania's standard falls short of the Act in all three tiers of water quality. (Ex. D–15.) Based on this fact alone, the court concludes that Pennsylvania officials have the ability to issue discharge permits in cases in which the state would be prohibited from doing so if

the state water quality standard complied with the Clean Water Act and regulations promulgated thereunder. See 40 C.F.R. § 131.21(c) ("A State water quality standard remains in effect, even though disapproved by EPA, until the State revises it or EPA promulgates a rule that supersedes the State water quality standard.")

However, evidence in the record demonstrates that Pennsylvania officials may actually have issued permits that have had a direct impact on the environment and that likely would not have been issued if Pennsylvania standards were acceptable to the EPA. On January 23, 1995, the Service notified the EPA that the DER issued permits for mine slurry impoundments, commonly known as "valley fills." (Ex. D–43.) In the letter, the Service states that the DER allowed a coal company to fill a tributary to Pine Run in Jefferson County, Pennsylvania, even though the DER's Regional Biologist concluded that the aquatic life [12] of the perennial stream would "undoubtedly be eliminated" if the permit were issued. Id. at 1–2. The Service observed that, "[u]nfortunately, valley fills may become much more common" because "[r]ecent legislation enacted in Pennsylvania has in effect legalized the issuance of more permits for valley fills whether or not existing uses are protected." Id. at 2. The Service concluded that "[w]e believe that specific language, such as that in 40 CFR 131.12(a)(1), is needed in order to protect existing uses and the level of water quality needed to maintain those uses in Pennsylvania." Id.

Defendants' assertion that Pennsylvania waters will not significantly degrade under the present standard is unpersuasive, even though the EPA has praised the Pennsylvania Special Protection Waters Program. The EPA has called the High Quality waters classification an "excellent vehicle to protect valuable waters in the Commonwealth."

(Ex. D–15 at 4.) However, only one-quarter of the state's waters fall into this category and, as discussed supra, EPA's position is that some High Quality waters still fall short of the federal standard. The EPA has stated that the Exceptional Value waters category is "even broader than the Federal definition" under Tier 3. Id. at 4. However, only about three percent of state waters fall within classification, and the EPA has told the DER that it should adopt language stating that there should be no new discharges into these waters.

The court concludes that, while the EPA has commended some aspects of Pennsylvania's program, it has informed the DER that its antidegradation policy fails to protect waters as required under federal law. There is the potential for the state's water quality to degrade under the present standard, and that state officials operating under the present standard have issued permits that have directly caused harmful environmental effects.

As to the fourth factor, Defendants have provided declarations and deposition testimony concerning the inconvenience and practical difficulty in preparing and promulgating a new or revised water quality standard for Pennsylvania as well as its need to prioritize in the face of limited resources.[13] The court considered this evidence as part of Proffitt's claims under the citizen-suit provision of the Act. The administrative record, however, does not speak to these issues. (See Defs.' Mem.Supp.Summ. J. at 28–30) (supporting its argument only with citations to evidence outside the administrative record).

Considering the four factors, the court finds that Defendants have failed to carry out § 1313(c)'s mandate for nineteen months and that such a delay is unreasonable in the context of the section's rigid calendar of deadlines. Further, the court finds that the

12. The stream contained 18 invertebrate taxa and three fish species. (Ex. D–43 at 1–2.)

13. For example, MacKnight declared that federal promulgation of a water quality standard for Pennsylvania would require significant resources because (1) Region III has never been responsible for preparing a federal promulgation package for a water quality standard; (2) EPA has never promulgated an antidegradation policy for a state; and (3) requiring Region III to prepare a standard for Pennsylvania would divert resources from other actions which are likely to have greater environmental consequences, and from other activities important to Pennsylvania's program. (MacKnight Decl. ¶ 16.)

consequences of the delay—the potential harm to Pennsylvania's waters and the aquatic life living therein—is significant. Finally, the administrative record does not support Defendants' claims of inconvenience, practical difficulty and need to prioritize.[14] For the above reasons, the court concludes that Defendants' delay is unreasonable and will grant Proffitt's motion and deny Defendants' motion on this ground.

**B. Claim Under 5 U.S.C. § 706(2)(A)**

■ Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Proffitt alleges that Defendants acted "not in accordance with law" by failing to comply with their regulations requiring it to "promptly propose and promulgate" the changes specified by the Regional Administrator in its disapproval notice.

■ Where judicial review includes action taken pursuant to agency regulations, validly promulgated regulations have the force of law. *Frisby v. United States Dep't of Hous. & Urban Dev.*, 755 F.2d 1052, 1055 (3d Cir.1985). When an agency fails to act in compliance with its own regulations, such actions are "not in accordance with law." *Id.* at 1055–56 (citations and quotations omitted). A court must give substantial deference to an agency's construction of its regulations. *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 150, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991). The court should defer to the agency's interpretation as long as it is "reasonable" or "sensibly conforms to the purpose and wording of the regulations." *Id.* at 150–51, 111 S.Ct. at 1175–76 (quotations omitted).

The relevant federal regulation provides: "If the State does not adopt the changes specified by the Regional Administrator within 90 days after notification of the Regional Administrator's disapproval, the Administrator shall promptly propose and promulgate such standard." 40 C.F.R. § 131.22(a). This regulation and 33 U.S.C. § 1313(c) contemplate the same result, which is the prompt compliance with the Act by states whose water quality standard has been disapproved by the Regional Administrator. The administrative record provided to the court reveals that, nineteen months after this duty arose, Defendants have not even begun to propose and promulgate a water quality standard for Pennsylvania. For the reasons set forth in Part III of this Memorandum, Defendants' interpretation of the mandatory duty imposed by § 131.22(a) is unreasonable and does not conform to the purpose and wording of that section or the regulatory scheme as a whole.

Because Defendants have failed to comply with their regulations, their decision not to promulgate a new or revised water quality standard for Pennsylvania is "not in accordance with law" under 5 U.S.C. § 706(2)(A). Therefore, the court will grant Proffitt's motion and deny Defendants' motion on this ground.

**C. Claim Under 5 U.S.C. § 706(2)(B)**

■ The APA also requires a reviewing court to "set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Plaintiff alleges that the EPA's failure to promptly prepare and publish a proposed water quality standard for Pennsylvania is contrary to the constitutional duty of the President to "take care that the Laws be faithfully executed. . . ." U.S. Const. art. II, § 3. Proffitt did not move for summary judgment on this ground, and Defendants did not submit affidavits that directly concern this issue. Neither party addressed whether the laws have

---

14. If the court were to consider Defendants' declarations and deposition testimony, its balance of the four factors would lead to the same result. The court would have accorded little weight to Defendants' assertion that preparing proposed regulations for Pennsylvania would require significant resources because the court believes that Defendants have overstated the time involved in preparing such regulations at this point in the process. The court, however, would accord greater weight to Defendants' assertion that other environmental projects would suffer if Region III is required to promulgate Pennsylvania's water quality standard.

been "faithfully executed" in this case. Because Defendants have not persuaded the court that they are entitled to relief, the court will deny Defendants' motion on this ground.

## V. PROFFITT'S REQUEST THAT THE COURT ORDER EPA TO OBEY THE REQUIREMENTS OF 33 U.S.C. § 1313(c)(4)

Proffitt also has moved for summary judgment on Count VI of his Complaint, in which it asks the court to order the EPA to (1) promptly prepare and publish an antidegradation policy for Pennsylvania that is consistent with the minimum requirements of 40 C.F.R. § 131.12 and (2) to promulgate an antidegradation policy consistent with the minimum requirements of 40 C.F.R. § 131.12 within ninety days after publication, pursuant to 33 U.S.C. § 1313(c)(4).

The court interprets this count to set forth a prayer for relief rather than a separate theory of liability. To the extent that the relief has been granted in the Order accompanying this Memorandum, the court will grant Proffitt's summary judgment motion on this count and deny Defendants' motion. To the extent that the relief is not granted elsewhere in the Order, the court will deny Proffitt's motion and grant Defendants' motion.

## VI. CONCLUSION

For the above reasons, Proffitt is entitled to judgment as a matter of law on Counts I, III, IV. The court will grant Proffitt's Motion for Summary Judgment on Counts I, III, and IV, and deny Defendants' Motion for Summary Judgment on those counts. The court also will partly grant and partly deny each party's motions as to Count VI. The court will order Defendants, immediately and without further delay, to "prepare and publish proposed regulations setting forth a new or revised water quality standard for the navigable waters involved." The court also will schedule a status conference for thirty (30) days from the date of the accompanying Order, at which time Defendants will inform the court, in detail, of the precise steps taken to accomplish this nondiscretionary statutory duty.

An appropriate Order follows.

## ORDER

AND NOW, TO WIT, this day of April, 1996, upon consideration of Plaintiff's Motion for Summary Judgment, and Defendants' response thereto, IT IS ORDERED that said motion is GRANTED IN PART AND DENIED IN PART. Defendants shall, immediately prepare and publish proposed regulations setting forth a revised water quality standard for the navigable waters involved, pursuant to 33 U.S.C. § 1313(c)(4). Plaintiff may file a petition for attorneys' fees and costs within the time provided by the Rules of Civil Procedure.

Upon consideration of Defendants' Motion for Summary Judgment, and Plaintiff's response thereto, IT IS FURTHER ORDERED that said motion is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that judgment is entered in favor of Plaintiff and against Defendants.

IT IS FURTHER ORDERED that a status conference on Defendants' progress in complying with this Order will be held at 9:30 a.m. on Monday, May 13, 1996, in Courtroom 17–B, United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania.