683 A.2d 818

JOHN GRIFFIN STRASENBURGH; JOHN B. STRASENBURGH, IN-
DIVIDUALLY AND AS TRUSTEE FOR BLAIR BALDWIN
STRASENBURGH, JOHN GRIFFIN STRASENBURGH, JR.,
GEORGE GUTHRIE APPLEGATE, OLIVER JAMES STRASEN-
BURGH, TOBY E.A. STRASENBURGH, SARAH HOUGHTON
STRASENBURGH, ALLISON WEBB STRASENBURGH, AMOS
EIGHMY APPLEGATE, AND SAMUEL CHURCH APPLEGATE;
SALLY STRASENBURGH APPLEGATE LANE, F/K/A SALLY
STRASENBURGH APPLEGATE; SUSAN HUFFARD BALL,
A/K/A FRANCES SUSAN WHEATON HUFFARD; COURTNEY
MONTAGU HUFFARD; PAUL PHILLIPPI HUFFARD, IV; TRE-
VOR LANSING HUFFARD; WHITNEY LANCASTER HUF-
FARD; ADA A. STRASENBURGH; LOUISE HOUGHTON STRA-
SENBURGH AND JAMES A. STRASENBURGH, PLAINTIFFS-
RESPONDENTS, v. GEORGE J. STRAUBMULLER, III; ROB-
ERT I. VEGHTE; EDWARD C. WHEATON; EDWARD SCOTT
WHEATON; JOHN THOMAS WHEATON; W. GLENN GIES
AND MICHAEL T. ZEE, DEFENDANTS-APPELLANTS.

WHEATON INC., FORMERLY KNOWN AS WHEATON INDUS-
TRIES, PLAINTIFF-APPELLANT, v. DOUGLAS FREDERICK
SMITH, A/K/A DOUGLAS F. SMITH, AND ANTHONY D. SMITH,
TRUSTEE FOR DOUGLAS FREDERICK SMITH, DEFEN-
DANTS, AND SUSAN HUFFARD BALL, P. PHILLIPPI HUF-
FARD, IV, TREVOR LANSING HUFFARD, WHITNEY LANCAS-
TER HUFFARD, COURTNEY MONTAGU HUFFARD, ROBERT
D. ROBERTSON, A/K/A ROBERT SHAW, FRANK H. WHEATON,
III, CUSTODIAN FOR AMANDA ELIZABETH WHEATON,
FRANK H. WHEATON, III, A/K/A FRANK H. WHEATON, III,
FRANK H. WHEATON, III, CUSTODIAN FOR CHRISTOPHER
BAINBRIDGE WHEATON, ADA A. STRASENBURGH, JAMES A.
STRASENBURGH, JOHN B. STRASENBURGH, JOHN GRIFFIN
STRASENBURGH, JOHN B. STRASENBURGH, TRUSTEE FOR
JOHN GRIFFIN STRASENBURGH, JR.; JOHN B. STRASEN-
BURGH, TRUSTEE FOR BLAIR BALDWIN STRASENBURGH,
LOUISE HOUGHTON STRASENBURGH, JOHN B. STRASEN-
BURGH, TRUSTEE FOR SARAH HOUGHTON STRASEN-
BURGH, JOHN B. STRASENBURGH, TRUSTEE FOR TOBY E.A.
STRASENBURGH, SALLY STRASENBURGH APPLEGATE
LANE, JOHN B. STRASENBURGH, TRUSTEE FOR SAMUEL
CHURCH APPLEGATE, JOHN B. STRASENBURGH, TRUSTEE

528

FOR AMOS EIGHMY APPLEGATE, JOHN B. STRASENBURGH, TRUSTEE FOR GEORGE GUTHRIE APPLEGATE, JOHN B. STRASENBURGH, TRUSTEE FOR ALLISON WEBB STRASENBURGH AND JOHN B. STRASENBURGH, TRUSTEE FOR OLIVER JAMES STRASENBURGH, DEFENDANTS–RESPONDENTS.

Argued April 29, 1996—Decided October 23, 1996.

530

*David J. Novack* argued the cause for appellants George J. Straubmuller, III, Robert I. Veghte, Edward C. Wheaton, Edward Scott Wheaton, John Thomas Wheaton, W. Glenn Gies and Michael T. Zee (*Budd Larner Gross Rosenbaum Greenberg & Sade*, attorneys; *Mr. Novack, Carl Greenberg* and *William D. Sanders*, on the briefs).

*Joseph H. Kenney* argued the cause for appellant Wheaton, Inc., etc. (*Kenney & Kearney*, attorneys; *Mr. Kenney, Mark Schwartz* and *Allen A. Etish*, on the briefs).

*Frederick L. Whitmer* argued the cause for respondents (*Pitney, Hardin, Kipp & Szuch*, attorneys for John Griffin Strasenburgh, et al. and *Morgan, Lewis & Bockius*, attorneys for respondents Frank H. Wheaton, III, and Robert D. Robertson a/k/a Robert Shaw; *Mr. Whitmer* and *Andrew L. Jewel*, on the brief).

The opinion of the Court was delivered by

O'HERN, J.

These appeals essentially concern a dispute about the management of a family business that began as a one-man glass works

and evolved into a multinational corporation. Wheaton, Inc. (Wheaton) is a large, but closely-held corporation that manufactures glass, plastics, and scientific equipment. (We use the present tense to describe the situation at the time when we heard this appeal.) All but one of Wheaton's shareholders are family members descended from Dr. Theodore Corson Wheaton, who founded the T.C. Wheaton Co. in 1888. *See generally* Virgil S. Johnson, *Millville Glass* 81–86, 101–06 (1971). Today, approximately 150 individual shareholders extend into the fifth generation of Wheaton descendants. The sole non-family member shareholder is Bowater, plc., a British company.

Over time, the shareholder-descendants of the founder began to disagree about the company's strategy for growth. Younger-generation shareholders believed that entrenched older-generation shareholders in management positions were impeding the company's growth. Disagreements about strategy turned into legal disputes among shareholders.

When the cases originally came to us they presented important issues of first impression concerning the New Jersey Business Corporation Act (BCA). *N.J.S.A.* 14A:1–1 to 16–4. Principal issues were whether a transfer of all assets by a corporation to wholly-owned subsidiaries triggered appraisal rights of dissenting shareholders for redemption of their shares at a fair value, and, if so, whether the company could later rescind the action that had triggered appraisal rights, thereby defeating the appraisal rights. Events, however, have overtaken the issues. The Legislature has amended the BCA to deny appraisal rights in transfers to wholly-owned subsidiaries. A foreign investor has taken over the company. The company no longer seeks to invoke its rescission of the restructuring and now agrees that the shares should be appraised. We conclude that all that essentially remains is a fair determination of the share-value rights of the dissenting shareholders. We direct that the judge conducting the appraisal proceedings take control of the remaining matters in controversy and conclude them as rapidly as is feasible.

## I

The first action that we consider, *Wheaton Inc. v. Smith,* involves the appraisal of fair value for the stocks belonging to the minority of shareholders who dissented from the company's 1991 plan for corporate restructuring. The second, *Strasenburgh v. Straubmuller,* involves a suit brought by twenty of the twenty-six dissenting shareholders in *Wheaton* against the board of directors of that company alleging that the directors abused their positions in the company by misappropriating corporate assets and opportunities, misusing company funds, and deflating the value of company stock.

The appraisal action arises from a December 1991 restructuring and recapitalization. At that time, a majority of Wheaton shareholders voted to transfer the assets of Wheaton to three newly-formed, wholly-owned subsidiaries in exchange for all the capital stock of each such subsidiary.[1] The company analogizes the asset transfer to putting its valued assets into three separate boxes. (Counsel used the metaphor of separating out a chest of diamonds, pearls, and emeralds into separate boxes within the chest. The contents of the chest are worth the same before and after the separation.) Management proposed the actions to facilitate an initial public offering of shares that would enable shareholders to find a market for their stock. Wheaton advised shareholders who did not approve of the restructuring of their right to dissent from the corporate action and to demand payment of fair value for their shares under *N.J.S.A.* 14A:11–1 to –8 of the BCA. (For convenience, we sometimes use shorthand references to the sections and subsections of the BCA as, for example, 11–4(2).) The relevant provisions of the BCA allow a shareholder objecting to certain forms of corporate action, such as a transfer of all assets, to dissent from the action and to demand payment of fair value for

---

[1] As part of the restructuring, the parent company's name was changed from Wheaton Industries to its current title, Wheaton, Inc. We refer to the parent company as Wheaton or "the company."

shares if the proposed corporate action is taken. Twenty-six shareholders, owning approximately fifteen percent of Wheaton's stock (the fair value recipients), dissented and submitted written notice of their intent to demand payment of fair value. The restructuring plan became effective on December 30, 1991. As required by 11–2(2), Wheaton sent to each of its shareholders written notice of the restructuring's effective date.

In January 1992, the twenty-six shareholders who dissented from Wheaton's restructuring plan made a written demand for payment of fair value for their shares, completing the definition of their status as "dissenting shareholders" under 11–3. Approximately the same day that the dissenting shareholders made that demand for payment of fair value, twenty of the twenty-six dissenting shareholders brought a separate action in the Superior Court of Morris County against individual directors of Wheaton (the North Jersey action). Their complaint accused the company's directors of fraud, misrepresentation, breach of fiduciary duty, waste, and violations of state and federal RICO laws.[2] The plaintiffs claimed that Wheaton's directors had misused their positions to manipulate assets and deflate the value of Wheaton stock. The complaint alleged that the older-generation shareholders who held management positions benefitted (for estate planning purposes) from the artificially deflated stock values and that the depressed value of the shares harmed the younger-generation shareholders. The trial court in the North Jersey action granted the defendants' motion to dismiss the complaint, determining that plaintiffs' claims of fraud and misrepresentation were vague and conclusory, that the claims of breach of fiduciary duty and waste were derivative, and that the state RICO claims failed to plead a

---

[2] RICO is an acronym (a shorthand expression) for the federal Racketeer Influenced and Corrupt Organizations statute, enacted in 1970 and contained in Chapter 96, Title 18 of the United States Code, 18 *U.S.C.A.* § 1961 to § 1968. The parallel State civil RICO statute is *N.J.S.A.* 2C:41–1 to –6.2. Because of the federal RICO claims asserted, the defendants removed the action to federal court. The federal district court granted the plaintiffs' motion to sever and remand the state claims, and stayed the federal RICO claims.

cause of action. The court held that all the claims, if valid, were derivative based on the plaintiffs' failure to show any "special injury" distinct from that suffered by all Wheaton shareholders. The plaintiffs appealed the trial court's decision.

Meanwhile, in the appraisal matter, Wheaton had offered to pay the dissenting shareholders $41.50 per share in response to their demand for payment of fair value. The dissenting shareholders rejected this offer and demanded that, pursuant to 11–7(1), Wheaton commence an action in Superior Court to determine the fair value of the stock. On April 23, 1992, Wheaton commenced the appraisal action in the Chancery Division of Superior Court for Cumberland County seeking a judicial determination of fair value for the approximately 762,000 shares of Wheaton stock held by the dissenting shareholders.

Three years later, on June 14, 1995, Wheaton's board of directors voted to rescind the 1991 corporate restructuring that had triggered the dissenting shareholders' appraisal rights. The company sought to avoid the financial ramifications of a fair value payment because it then appeared to management that the company's fortunes had declined. Invoking 11–4(1)(e), which provides for termination of a shareholder's appraisal rights if "the proposed corporate action is abandoned or rescinded," Wheaton sought to dismiss the appraisal action (the rescission motion). The trial court denied Wheaton's application, holding that rescission of a triggering corporate action after its effective date could not terminate appraisal rights that had vested. On August 2, 1995, the Appellate Division denied Wheaton's motion for leave to appeal that decision.

On August 8, 1995, the Appellate Division rendered its decision in the *Strasenburgh* matter. The court affirmed the dismissal of the claim for waste but remanded the remaining claims, holding that the plaintiffs' theory of a "disparate impact" between the older and younger generations stated an individual cause of action. *Strasenburgh v. Straubmuller*, 284 *N.J.Super.* 168, 179, 664 *A.*2d 497 (App.Div.1995). The court found that the alleged manipu-

lation by the board of the company's assets and stock values in effect created two classes of shareholders. One class, made up of the older shareholders who controlled the company, benefitted from lower stock values through the potential of reduced estate tax liabilities; while the class of younger shareholders suffered from the depressed value of their shares. The court held this disparate impact between the two classes of shareholders sufficient to state individual, not derivative, claims of breach of fiduciary duty and fraud on the part of Wheaton's directors. On December 7, 1995, we granted the petition for certification filed by the directors in the *Strasenburgh* matter. 143 *N.J.* 324, 670 *A.*2d 1065 (1995).

Several days later, on December 15, 1995, the Legislature amended the applicable provisions of the BCA. Under one amendment, the type of corporate restructuring that Wheaton undertook, an intra-corporate transfer of assets from a parent corporation to wholly-owned subsidiaries, no longer triggers dissent and appraisal rights. *N.J.S.A.* 14A:10–11(4), 11–1(1)(b) (as amended by *L.* 1995, *c.* 279, § 16, § 21, eff. Dec. 15, 1995). Shortly after the new law became effective, Wheaton renewed its request that the trial court dismiss the appraisal action. It contended that the amendments clarified the impact of the prior law to deny appraisal rights and that the amendments applied retroactively, thereby terminating the dissenting shareholders' rights to the fair value of their stock (the retroactivity motion). The trial court denied that motion.[3]

We had granted Wheaton's motion for leave to appeal the denial of the rescission motion and subsequently granted Wheaton's motion for direct review of the retroactivity motion. The case was argued before us on April 29, 1996.

Still new circumstances have arisen since the oral argument. On May 1, 1996, Wheaton announced "an acquisition merger" with

---

[3] The taking of testimony in the appraisal action concluded on February 26, 1996, and the trial court is ready to enter judgment.

Alusuisse–Lonza Holding Ltd., a Swiss holding company. Under the provisions of the merger, the effective date of which was April 29, 1996, Wheaton shareholders received $63.00 per share from Alusuisse. Alusuisse has requested that Wheaton's counsel withdraw its appeals in the *Wheaton* appraisal matter. This decision to withdraw the appeals undoubtedly stems from Alusuisse–Lonza's belief that the fair value of the shares when surrendered in 1991 was lower than the 1996 acquisition price of $63.00. Accordingly, Wheaton has again reversed its position and now seeks to withdraw its appeal and to accept the appraisal of the trial court. The dissenting shareholders argue that granting the withdrawal of the appeals would prejudice their rights. They ask the Court to dismiss Wheaton's motions, affirm the rulings on appeal, and remand to the trial court for determination of the fair value of their stock as of 1991.

II

As noted, major issues that we originally undertook to review are basically moot. Both the company and the dissenting shareholders now want the appraisal action to proceed.

Ordinarily, an appeal may not be dismissed if the dismissal would prejudice the opposing party. *State v. Gaffey,* 92 *N.J.* 374, 382, 456 *A.*2d 511 (1983). It is difficult to see how granting Wheaton's motion to withdraw its appeals will prejudice the dissenting shareholders because both sides now desire a determination of fair value for the stock.

Nevertheless, the dissenting shareholders argue that we should resolve the issues to avoid leaving the law in a state of confusion. The parties have not helped to avoid the confusion that they now ask us to resolve. Wheaton first informed its shareholders that they had a right to dissent from the appraisal, then argued that the shareholders had no appraisal rights under the statute. On April 29, 1996, Wheaton implored us at oral argument to consider its poor financial condition when it appears to have known that a merger at $63.00 a share was in the wings, if not signed and

sealed. (Of course, the merger does not augment Wheaton's treasury.) Wheaton now argues that the dissenting shareholders should have appraisal rights. Some of the original dissenting shareholders no longer seek the appraisal remedy. Nonetheless, the issues of rescission and retroactivity may recur and we address them briefly.

### A.

### *The Rescission Issue*

At first glance, the relevant provisions of the BCA on rescission rights present a conflict.

(1) A corporation may terminate the "right of a dissenting shareholder" to be paid fair value if a "proposed corporate action is abandoned or rescinded." *N.J.S.A.* 14A:11–4(1)(e).

(2) A "dissenting shareholder" is one who has "made demand for payment" of shares *after* notice of the "effective date" of the corporate action. *N.J.S.A.* 14A:11–3(1).

(3) Notice of the effective date of the action shall be given by the corporation within "10 days *after* the date" thereof. *N.J.S.A.* 14A:11–2(2) (emphasis added).

The word "proposed" in 11–4(1)(e) creates the confusion. Because a shareholder's demand for payment of fair value must be made after the effective date of the corporate action, it would appear to follow that rescission of the corporate action, thereby terminating the shareholder's right to demand payment, may also take place after the effective date of the action. Yet, 11–4(1)(e) provides that a dissenting shareholder's right to payment of fair value for his shares may be terminated if "the *proposed* corporate action is abandoned or rescinded[.]" (Emphasis added.)

The language of 11–4(1)(e) appears intrinsically inconsistent. Ordinarily, one does not rescind a proposed action. Moreover, if the "rights of a dissenting shareholder" do not arise until *after* the effective date of an action, what rights are there to terminate if

the "proposed" action has never taken place? Still, the fair value recipients argue that the plain meaning of the word "proposed" in 11–4(1)(e) allows the corporation to rescind a disputed action only prior to its effective date. They rely in part on New York cases interpreting appraisal provisions of the New York Business Corporation Law (the New York Act) that held that rescission of a triggering corporate action before its effective date divests appraisal rights.[4] *See N.Y. Bus. Corp. Law* § 623 (McKinney 1996). None of those cases dealt with the precise issue before us, i.e., whether rescission of a corporate action *after* its effective date may divest appraisal rights. On the contrary, the New York cases dealt with corporate actions that had yet to be consummated and the shareholders' premature application for appraisal rights. *See, e.g., In re Valando,* 67 *Misc.*2d 515, 323 *N.Y.S.*2d 608, 609 (Sup.Ct. 1971) (holding that shareholder's right to receive payment for shares of stock under dissent statute does not vest unless objectionable corporate action taken); *Standard Brewing Co. v. Peachey,* 202 *Misc.* 279, 108 *N.Y.S.*2d 583, 588 (Sup.Ct.1951) (holding that shareholders have no right to appraisal and payment for stock under proposed corporate action). *But see In re McKinney,* 306 *N.Y.* 207, 117 *N.E.*2d 256, 259 (1954) (appearing to contemplate rescission after action taken).

■■■ Our goal in statutory construction is to determine the intent of the Legislature, which is ordinarily most clearly indicated by the statutory language. *Medical Soc'y v. Department of Law & Pub. Safety,* 120 *N.J.* 18, 26, 575 *A.*2d 1348 (1990). However, a "construction that will render any part of a statute inoperative, superfluous, or meaningless, is to be avoided." *State v. Reynolds,* 124 *N.J.* 559, 564, 592 *A.*2d 194 (1991). Interpreting the words "abandoned" and "rescinded" in section 11–4(1)(e) to apply only to a "proposed" corporate action would entirely nullify 11–4(1)(e) as a

---

4 Our Legislature did rely in part on the then-current section 623 of the New York Act when drafting the relevant provisions. In the absence of New Jersey case law interpreting those provisions, reliance on New York case law is appropriate.

means for terminating a shareholder's right to demand payment of fair value for shares because a shareholder may only demand such payment after the effective date of the corporate action pursuant to 11–2(3). We believe that construction does not comport with the Legislature's intent in drafting those provisions.

Of course, one might attribute a generic meaning to the words "dissenting shareholders" in 11–4(1)(e) as those who have indicated an initial intent to dissent from the proposed action. But if that were so, there would be no reason for the provisions of 11–4(2) that condition any termination of appraisal rights on an award to the dissenting shareholder of "any intervening preemptive rights ... dividend[s] or distribution[s]." Because the usual time cycles for dividends are at least quarterly, the statute appears to contemplate the passage of a significant period of time between the triggering corporate action and termination of appraisal rights.

The legislative history of 11–4(1)(e) discloses that the word "proposed" appears in early drafts of the act, which were drawn from the Model Business Corporation Act (the Model Act). *See N.J.S.A.* 14A:11–4 "Source or Reference." The minutes of the New Jersey Corporation Law Revision Commission's 104th meeting show that the BCA later moved away from the Model Act's time sequence to its own unique sequence, based in part on the then-existing New York Act. The Commission voted that the BCA "be amended to ... insert a new subsection (2) [authorizing dissent and appraisal rights] patterned after § 623(b) of the New York Act, except that the notice mentioned in § 623(b) should be sent after the effective date of the [corporate] action rather than after the shareholders' authorization date." *See New Jersey Corporation Law Revision Commission, Minutes of 104th Meeting* (March 11, 1965).

Notably, the BCA's current time frame is unlike that of both the former Model Act and the current New York Act. The BCA and the Model Act are alike in that both require a non-consenting shareholder to complete two steps in order to perfect the right to

be paid fair value: the shareholder must first notify the corporation of the intention to dissent and then must serve demand on the corporation for the payment of fair value. Under section 74 of the Model Act, step two is accomplished by the shareholder making written demand for payment within ten days after the vote authorizing the proposed corporate action; thus, the right to fair value may be perfected before the effective date of the corporate action. In New Jersey, however, step two takes place *after* the effective date. *See N.J.S.A.* 14A:11–2(3).

Notably, New York's current statute is both different and similar to the BCA. New York requires that the shareholder file a notice of election to dissent, but does not require the shareholder to file an additional notice of demand for fair value. *See N.Y. Bus. Corp. Law* § 623(c). Significantly, New York has since amended section 623 to delete the reference to a corporation having "rescinded" a "proposed" act.[5]

The rhetorical question thus posed by the company is why does the BCA even mention rescission rights if there is no right to rescind after the triggering action is taken:

[S]ince [a] dissenter['s] right to be paid fair value does not exist until after the completion of corporation action, New Jersey corporations would be left with a classic paradox and meaningless remedy, *i.e.,* there would be no need to rescind prior to the completion of corporation action and no ability to do so afterward. In effect, a corporation could rescind only when it didn't need to. Certainly the Legislature never intended such a Catch 22 type result.

■ "It is a venerable principle that a law will not be interpreted to produce absurd results." *K Mart Corp. v. Cartier, Inc.,* 486 *U.S.* 281, 325 n. 2, 108 *S.Ct.* 1811, 1835 n. 2, 100 *L.Ed.*2d 313, 345 n. 2 (1988) (Scalia, J., concurring in part and dissenting in part).

─────────

5   If a notice of election [to dissent] is withdrawn, or the corporate action is rescinded, or a court shall determine that the shareholder is not entitled to receive payment for his shares, or the shareholder shall otherwise lose his shares and he shall be reinstated to all his rights as a shareholder as of the consummation of the corporate action, including any intervening preemptive rights and the right to payment of any intervening dividend or other distribution....

[*N.Y.Bus.Corp.Law* § 623(e).]

Thus, our function is to make sense of a statute. *In re Executive Comm'n on Ethical Standards Re: Appearance of Rutgers Att'ys,* 116 *N.J.* 216, 221, 561 *A.*2d 542 (1989). It would make little sense to provide for termination of appraisal rights but only if appraisal rights have not arisen. On balance, we believe that the Legislature intended that a corporation be given a reasonable right to rescind corporate action that has triggered appraisal rights. After all, the shareholders' preliminary notice of intent to dissent (provided in 11–4) is just that. Appraisal rights do not vest unless there is a demand under 11–2(3). It is one thing to forge ahead with the restructuring of a corporation if 2% of shareholders demand appraisal rights and quite another to be locked into an action if 49% of shareholders actually demand these rights. This is the common sense of the situation and the interpretation that we believe our Legislature intended.

We cannot accept, however, Wheaton's argument that the Legislature intended to allow rescission of a corporate action any time after its effective date. Wheaton made its decision to rescind the 1991 restructuring some three and one-half years after the restructuring was completed. Although 11–4(1)(e) places no time restraint on the corporation's ability to rescind and terminate the dissenting shareholder's appraisal rights, principles of logic and statutory interpretation would require the corporation to rescind its action within a reasonable time after the effective date. *See In re Hake,* 285 *A.D.* 316, 136 *N.Y.S.*2d 817, 821 (holding that "[i]f the corporate officers and directors fail to act within a reasonable time and resolution is not rescinded, an order for appraisal and payment for the dissenting stockholder's stock should be made."), *appeal dismissed,* 308 *N.Y.* 940, 127 *N.E.*2d 90 (1955); *Raymond Proffitt Foundation v. E.P.A.,* 930 *F.Supp.* 1088, 1100 (E.D.Pa. 1996) (holding that when statute does not provide time for prescribed act court must infer that Legislature intends that act be done within reasonable time).

Were it otherwise, the interminable termination right would become a one-way street for a corporation to play the market. If

the fair value of the company's shares goes up between demand and valuation, a dissenting shareholder may not, without consent of a company, withdraw a demand for fair value, 11–5(1), and take the higher current value. On the other hand, if the company's fortunes wane and share values go down, the company might, at any time, rescind the action and saddle dissenting shareholders with the lower current values. This is simply not fair. Once shareholders make a demand for payment, they surrender all rights as shareholders. *N.J.S.A.* 14A:11–3(2). They are outsiders without a voice in company affairs. In addition, they will have wasted time, money, and emotional resources in the appraisal contest.

In assessing a passage of time that is both reasonable and equitable to the parties involved, a court must consider the corporation's financial position and the consequences of forcing payment of fair value, as well as the prejudice to the dissenting shareholders by allowing rescission. In this case, we need not debate what is a fair balance of the factors because both parties now seek the appraisal remedy.

### B.

### *The Retroactivity Issue*

The retroactive application of the amendment of the BCA concerning transfer of assets to wholly-owned subsidiaries requires a similar fact-oriented analysis.

We recently restated the principles that determine whether statutes should be applied retroactively:

It is well-settled that statutes generally should be given prospective application. *Gibbons v. Gibbons,* 86 *N.J.* 515, 521, 432 *A.*2d 80 (1981). "It is a fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair." *Gibbons, supra,* 86 *N.J.* at 522, 432 *A.*2d 80. It is "presumed that provisions added by the amendment affecting substantive rights are intended to operate prospectively." *Schiavo v. John F. Kennedy Hosp.,* 258 *N.J.Super.* 380, 385, 609 *A.*2d 781 (App.Div.1992), *aff'd,* 131 *N.J.* 400, 620 *A.*2d 1050 (1993). We apply "a two-part test to determine whether a statute could be applied retroactively." *Phillips v. Curiale,* 128 *N.J.* 608, 617, 608 *A.*2d 895 (1992). The first part

questions "whether the Legislature intended to give the statute retroactive application." *Ibid.* The second part involves "whether retroactive application of that statute will result in either an unconstitutional interference with 'vested rights' or a 'manifest injustice.'" *Ibid.* In applying this test generally, there are three circumstances that will justify a retroactive application of a statute: (1) where the Legislature has declared such an intent, either explicitly or implicitly; (2) where the statute is curative; and (3) where the expectations of the parties warrant retroactive application. *Gibbons, supra,* at 522–23, 432 *A.*2d 80; *see Savarese v. New Jersey Auto. Full Ins. Underwriting Assoc.,* 235 *N.J.Super.* 298, 308, 562 *A.*2d 239 (1989) (finding an expressed intent to apply statute retroactively). However, even if a statute is found to apply retroactively based on those factors, under the second prong of the basic test, retroactive application must not "result in 'manifest injustice' to a party adversely affected by such application." *Gibbons, supra,* 86 *N.J.* at 523, 432 *A.*2d 80.

"The 'curative' exception comes into play when a statute amends a previous law which is unclear or which does not effectuate the actual intent of the Legislature in adopting the original act." *Schiavo, supra,* 258 *N.J.Super.* at 386, 609 *A.*2d 781. The purpose of a curative amendment is merely to "remedy a perceived imperfection in or misapplication of a statute." *Ibid.*

[*In re D.C.,* 146 *N.J.* 31, 50–51, 679 *A.*2d 634 (1996).]

It is arguable that the act is intended to remedy a perceived imperfection or misapplication of the BCA. The company points out that the twenty-one of twenty-two jurisdictions that permit appraisal rights on the sale of assets do not permit appraisal rights on the transfer of assets to wholly-owned subsidiaries.

The more difficult task is to apply the second prong of the test—whether retroactive application of the statute results in either an unconstitutional interference with vested rights or a manifest injustice.

In *Phillips v. Curiale, supra,* 128 *N.J.* at 625, 608 *A.*2d 895, we explained that traditionally, "inchoate tort claims have not been regarded as vested rights of sufficient status to withstand" legislative intent to apply statutes retroactively. Of course, these are not tort claims. Because the appraisal rights were statutorily created, it is unlikely that they would have sufficient status to withstand a legislative intent that the amendments be retroactive. The remaining question is whether retroactive application of the amendments would result in a manifest injustice. "[R]etroactive application of civil legislation generally does not violate due pro-

cess unless the consequences are particularly harsh and oppressive." *Id.* at 622, 608 *A.*2d 895.

The company argued before us that shareholders would suffer no injustice because they would be fully restored to their status as shareholders. On the other hand, the shareholders argue that they cannot be returned to their earlier status. They have invested considerable sums of money in pursuing the momentous election to redeem their shares, a decision that they were forced to make within a matter of days over the 1991 holiday season. In addition, they assert that they have unalterably changed their lives in separating themselves from the family corporation. Again, because both parties now seek the appraisal remedy, the Court need not resolve the factual question whether it would be manifestly unjust to apply the statute retroactively in these circumstances. Should there be other business corporations similarly situated (having rescinded a triggering action taken before the amendments), a careful factual analysis would have to be made before the statute could be applied retroactively.

Because, then, Wheaton's motion to dismiss its appeal and the fair value recipients' request to affirm the rulings below reach the same result, we affirm the rulings of the trial court on the rescission motion and the retroactivity motion.

We direct, however, that the trial court be permitted in its discretion to reopen the record in the appraisal proceedings for consideration of events that have transpired since the hearing closed. Specifically, the trial court may take into account the position of Wheaton's directors in the North Jersey litigation that the court in the appraisal proceeding may consider whether the conduct of the directors had artificially depressed the value of the stock. See *infra* at 548, 683 *A.*2d at 828. The court may also consider the company's recent merger in making a just and equitable determination of the appraisal value as of 1991. Before us, the company argued that its financial condition had deteriorated between 1991 and 1996. We realize that the trial court in the appraisal action has determined to limit proofs to the events at the

time of the December 1991 valuation. We surmise that these matters of artificial deflation of stock values were fully canvassed in that proceeding and if the court is satisfied to enter judgment on the record before it, it may do so.

### III

The more difficult matter before us is Wheaton's appeal of the *Strasenburgh* matter, brought by twenty of the twenty-six dissenting shareholders in *Wheaton*. The gist of their claims is that Wheaton's management structure was entrenched in the third generation descendants of Dr. Theodore Corson Wheaton. Those older shareholders, who owned the largest share of the company's stock, are alleged to have had an interest in depressing the value of Wheaton's stock to reduce potential federal estate taxes. Plaintiffs assert that the management actions resulted in the depressed value of the shares of younger-generation shareholders, thus causing them injury for which they may bring individual actions for damages against the board of directors. The allegations can be grouped in five general categories: (1) misappropriating corporate assets and opportunities (such as misuse of corporate credit cards, facilities, and the company jet); (2) misleading shareholders into approving a liquidity plan that reduced the liquidity of shares; (3) rejecting fair offers to purchase the company; (4) creating a voting trust in which a group of "favored" shareholders participated to the detriment of plaintiffs; and (5) devising a stock recapitalization plan unfair to shareholders seeking liquidity.

### A.

#### *The Exclusivity Issue*

Defendant directors argued before us that the dissenting shareholders had forfeited any rights to bring shareholder actions by their election to dissent from the 1991 restructuring plan. Section 14A:11–3(2) provides that "[u]pon making [a] demand [to dissent],

the dissenting shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of [the] shares. . . ." New Jersey adopted this language from the analogous New York provision. *See N.Y. Bus. Corp. Law* § 623(e).

Like New York, New Jersey provides that the appraisal remedy is exclusive. *N.J.S.A.* 14A:11–5(2) ("The enforcement by a dissenting shareholder [of appraisal rights] shall exclude the enforcement of any other right to which [the shareholder] might otherwise be entitled . . . except that this subsection shall not exclude the right of [a shareholder] to bring or maintain an appropriate action to obtain relief on the ground that such corporate action will be or is ultra vires, unlawful or fraudulent as to such dissenting shareholder."). The New York language is similar. *See N.Y. Bus. Corp. Law* § 623(k) ("The enforcement by a shareholder [of appraisal rights] shall exclude the enforcement by such shareholder of any other right to which [the shareholder] might otherwise be entitled . . . except that this section shall not exclude the right of such shareholder to bring or maintain an appropriate action to obtain relief on the ground that such corporate action will be or is unlawful or fraudulent as to [the shareholder]."). In contrast, the 1960 Model Act provides no exceptions for bringing suit once a shareholder has dissented. *See* Model Act § 74 (1960) ("Any shareholder making [a demand for appraisal rights] shall thereafter be entitled only to payment as in this section provided. . . ."). The statutes in both New Jersey and New York appear to limit the exclusivity of the appraisal remedy to the triggering corporate action.

However, a theme that runs through the exclusivity and appraisal provisions is whether the appraisal remedy will provide all the relief to the aggrieved parties that is required. The New York Court of Appeals has taken a narrow view of this interplay, but has allowed the possibility of some equitable relief. In *Breed v. Barton*, 54 *N.Y.*2d 82, 444 *N.Y.S.*2d 609, 610, 429 *N.E.*2d 128, 129 (1981), the court stated that in choosing the appraisal remedy, the dissenting shareholders abandoned their alternative rights as

shareholders. In *Breed*, even though there were allegations of fraud, the court held that allowing a cause of action in addition to the appraisal proceeding would be duplicative, in that the appraisal proceeding will provide dissenting shareholders with a sufficient recovery of the value of their shares. *Id.* 444 *N.Y.S.*2d at 611, 429 *N.E.*2d at 130. In contrast, in *Kademian v. Ladish Co.*, 792 *F.*2d 614 (7th Cir.1986), the court allowed minority shareholder claims against directors who had allegedly induced a merger at below market value. The Seventh Circuit allowed the state claims of fraud and misrepresentation to proceed over the objection that the Wisconsin appraisal remedy was exclusive. The decision, however, contains no discussion of whether the majority shareholders had pursued the appraisal remedy or whether that remedy would fully compensate the shareholders for their losses. The court did note that some of the complainants had sold their shares before the triggering merger that would give rise to appraisal rights.

The argument of defendant directors for exclusivity of the appraisal remedy would have been more persuasive had not the same directors pressed corporate counsel to oppose the appraisal rights of the dissenting shareholders on the ground that the format of the 1991 restructuring did not trigger dissent and appraisal rights. Had the directors' arguments been accepted in each of the courts, the shareholders would have *no* remedy for the misconduct.

We believe that the *Breed* analysis is more persuasive. Whether the claimed damages will be fully recoverable in the appraisal action depends on further analysis of the claims, which analysis is also relative to determining whether the claims are derivative.

### B.

#### The Derivative Suit Issue

A shareholder derivative action is a unique and anomalous legal remedy. "The purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the inter-

ests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Kamen v. Kemper Financial Svcs., Inc.,* 500 *U.S.* 90, 95, 111 *S.Ct.* 1711, 1716, 114 *L.Ed.*2d 152, 163 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.,* 337 *U.S.* 541, 548, 69 *S.Ct.* 1221, 1226, 93 *L.Ed.* 1528, 1537 (1949)). The action functions as both a sword and a shield to directors. It is a sword in the hands of shareholders, yet it shields directors from direct shareholder actions for certain injuries. In their treatise, *Shareholder Derivative Litigation,* Ralph C. Ferrara, Kevin T. Abikoff, Laura Leedy Gansler and Shon Morgan give an example of directors' misconduct that may give rise to both a derivative action and a direct shareholders' action. The example is of directors making a worthless investment in untested technology while touting the optimistic potential of the technology. Investors deceived by the recklessly optimistic statements that occasioned shareholders to buy or retain their shares may sue for the direct injuries that they suffered. Shareholders may also sue for the derivative injury to the corporation for the imprudent and wasteful investment in faulty technology. The distinction between the two types of action is crucial. *See* Ralph C. Ferrara, *et al., Shareholder Derivative Litigation* § 1.02 (1996).

A corporation is regarded as an entity separate and distinct from its shareholders. *Dep't of Labor v. Berlanti,* 196 *N.J.Super.* 122, 481 *A.*2d 830 (App.Div.), *certif. granted,* 99 *N.J.* 151, 491 *A.*2d 666 (1984), *and appeal dismissed,* 101 *N.J.* 568, 503 *A.*2d 846 (1985). It is a principle of corporation law that "[r]egard for the corporate personality demands that suits to redress corporate injuries which secondarily harm all shareholders alike are brought only by the corporation." Note, *Distinguishing Between Direct and Derivative Shareholders' Suits,* 110 *U. Pa. L.Rev.* 1147, 1148 (1962) (citing *Smith v. Hurd,* 53 *Mass.* 371, 384–85 (1847)) (hereinafter *Distinguishing* ). Reasons of policy and practicality more than abstractions about the nature of a corporation underlie the principle. The policy reasons include maintaining the investment resources of the corporation, avoiding a multiplicity of

suits, providing equal benefit for all shareholders and avoiding partial dividends or partial liquidation. *Distinguishing, supra,* 110 *U.Pa. L.Rev.* at 1148. The prevailing American rule is that "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively in behalf of the corporation." *Cowin v. Bresler,* 741 *F.*2d 410, 414 (D.C.Cir.1984).

New Jersey accepts the general principle. "Shareholders cannot sue for injuries arising from the diminution in value of their shareholdings resulting from wrongs allegedly done to their corporations." *Pepe v. General Motors Acceptance Corp.,* 254 *N.J.Super.* 662, 666, 604 *A.*2d 194 (App.Div.), *certif. denied,* 130 *N.J.* 11, 611 *A.*2d 650 (1992). Under the BCA shareholders may not bring derivative actions except in compliance with statutory requirements and Rules of Court. *N.J.S.A.* 14A:11–7, *R.* 4:32–5. *See In re Prudential Ins. Co. Derivative Litigation,* 282 *N.J.Super.* 256, 268–70, 659 *A.*2d 961 (Ch.Div.1995) (outlining history and purposes of Rule). The general rule that claims of diminution in share value are derivative permits a "special injury" exception, which has yet to be widely addressed in our courts. A special injury exists "where there is a wrong suffered by [a] plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote." *In re Tri–Star Pictures, Inc.,* 634 *A.*2d 319, 330 (Del. 1993).

The statement of such principles is easy. The actual determination of whether a suit involves derivative or individual claims of shareholders is not. Delaware, which has a well developed body of law on this subject, has long recognized a sharp distinction between derivative and individual actions. "The distinction is important because derivative actions are deemed to belong to the subject corporation whereas individual actions do not." *Weinberger v. Lorenzo,* 1990 WL 156529 at *2 (Del.Ch. Oct.12, 1990)

(quoting DeMott, *Shareholder Derivative Actions Law and Practice* § 2:01 (1987)).

To determine whether a complaint states a derivative or an individual cause of action, courts examine the nature of the wrongs alleged in the body of the complaint, not the plaintiff's designation or stated intention. *Lipton v. News Int'l Plc,* 514 A.2d 1075, 1078 (Del.1986). *Elster v. American Airlines, Inc.,* 34 Del.Ch. 94, 100 A.2d 219 (1953), held that a shareholder may maintain an individual action against a corporation or its directors if the shareholder sustained a "special injury." The court defined a special injury as "a wrong inflicted upon [the shareholder] alone or a wrong affecting any particular right which [the plaintiff] is asserting, such as ... pre-emptive rights as a stockholder, rights involving the control of the corporation, or a wrong affecting the stockholders and not the corporation." *Id.* 100 A.2d at 222.

In *Moran v. Household Int'l, Inc.,* 490 A.2d 1059 (Del.Ch.), *aff'd,* 500 A.2d 1346 (Del.1985), the court explained: "To set out an individual action, the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders' or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." *Id.* at 1070 (citations omitted). In *Lipton,* the Delaware Supreme Court combined the *Elster* and *Moran* tests, stating that

a plaintiff alleges a special injury and may maintain an individual action if he complains of an injury distinct from that suffered by other shareholders or a wrong involving one of his contractual rights as a shareholder. Moreover, while *Moran* serves as a quite useful guide, the case should not be construed as establishing the only test for determining whether a claim is derivative or individual in nature. Rather, as was established in *Elster,* we must look ultimately to whether the plaintiff has alleged "special" injury in whatever form.

[*Lipton, supra,* 514 A.2d at 1078.]

Claims of waste (recall the example of the investment in faulty technology) will always be derivative claims. *Shearin v. E.F. Hutton Group, Inc.,* 652 A.2d 578, 591 (Del.Ch.1994) ("A claim for corporate waste is classically derivative."). Claims of

breach of fiduciary duty on the part of directors will also be generally regarded as derivative claims unless the injury to shares is distinct. *See Small v. Goldman,* 637 *F.Supp.* 1030 (D.N.J.1986) (holding plaintiff had individual cause of action arising out of conspiracy by directors to compel sale of plaintiff's shares below value). If the breach of duty causes a "special injury," shareholders may sue directly. For example, claims against directors for the selective dissemination of information to one group of shareholders over another are not derivative in nature because the unfair dealing unequally affects shareholders that were deprived of the information. *Tri–Star, supra,* 634 *A.*2d at 331–32; *Barbieri v. Swing–N–Slide Corp.,* 1996 WL 255907 (Del.Ch. May 7, 1996).

Claims of entrenchment by directors often fall into the same category of stating either a direct or derivative claim, depending on whether the entrenchment affects shareholders unequally. For example, *Spillyards v. Abboud,* 278 *Ill.App.*3d 663, 215 *Ill.Dec.* 218, 662 *N.E.*2d 1358 (1996), held that a breach of fiduciary duty engaged in for the purpose of entrenchment stated an individual claim and not a derivative claim. *Spillyards* involved a challenge to a stock purchase agreement under which the purchasers were bound to vote their shares for incumbent directors. The court agreed with the plaintiff shareholders that that voting restriction "had the purpose of entrenchment and affected the other shareholders' voting rights in that the shareholders' ability to have nominees other than the Board's nominees elected was diluted." *Id.* 215 *Ill.Dec.* at 223, 662 *N.E.*2d at 1363. Claims of entrenchment without corresponding allegation of direct harm to shareholders' contractual rights, however, set forth derivative claims only. *Moran, supra,* 490 *A.*2d at 1070.

Concededly, a thin line often separates actions that are derivative or individual. *Kramer v. Western Pac. Indus., Inc.,* 546 *A.*2d 348, 352 n. 3 (Del.1988). For example, when preferred shareholders of Eastern Airlines complained that Frank Lorenzo had manipulated the assets of Eastern by switching assets from Eastern to Continental Airlines, the non-union airline under the com-

mon control of the parent, Texas Air, the Eastern preferred shareholders claimed that they had suffered a special injury to their preferred status. Yet, the court held that they did not suffer any injury distinct from that of all other Eastern Airline shareholders. *Weinberger, supra,* 1990 WL 156529 at *1.

In *Yanow v. Teal Indus. Inc.,* 178 *Conn.* 262, 422 *A.*2d 311 (1979), the majority had misused its powers by systematically looting assets from one corporation to the special detriment or injury of minority shareholders because the assets were transferred to a corporation wholly owned by the majority interests. That did not occur here.

A closer case is *Williams v. Geier,* 671 *A.*2d 1368 (Del.1996). In that case, the board of directors of Cincinnati Milacron approved a recapitalization of stock that diluted the voting rights of non-long-term share owners (analogously younger-generation shareholders). The long-term shareholders were afforded greater voting rights. The *Geier* court concluded that the claims of the newcomer Cincinnati Milacron shareholders were individual and not derivative.

■ The claims of waste in the context of derivative actions have already been discussed. *See supra* at 551, 683 *A.*2d at 830. The remaining claims in the North Jersey action, listed *supra* at 546, 683 *A.*2d at 827, are more troubling. The "Liquidity Plan" adopted in April 1991 granted the company a ninety-day right of refusal before shareholders could sell shares to a non-descendant. Plaintiffs allege that, contrary to company representations, the plan reduced liquidity and deprived them of a substantial portion of their share value. The directors rejected the $64.00 per share proposal Bowater made in August 1991. Plaintiffs allege that the proposal established that the company knew the true value of the company in 1991. During that same period, in fact, Bowater purchased 100,000 shares from Frank H. Wheaton, Jr. Plaintiffs allege the "voting trust" was part of a plan of misrepresentation intended to prevent shareholders from realizing the full value of the shares. Finally, under the December 1991 recapitalization

plan, shareholders would have been required to exchange their common stock for one of two new classes of stock. Class "A" stock has ten votes per share, but cannot be transferred outside the Wheaton family without losing 9 of its 10 votes. Class "B" stock is freely transferrable and pays slightly higher dividends, but has only one vote per share. The recapitalization may have had the effect of diluting the voting rights of the dissenting class of shareholders (the younger generation) because they were presumably the only shareholders seeking a public market for their stock.

Despite the varied wrongs alleged, the essential nature of the injuries claimed is a diminution in share value. For the most part, the North Jersey complaint alleges that "artificially deflated" stock values resulted from the directors' actions. Nothing in their allegations suggests that the diminution in value of Wheaton's stock did not affect all of Wheaton's shareholders, young or old. The allegation that the older shareholders benefitted through depressed estate taxes fails to show a "special injury" that would allow the younger-generation shareholders to bring individual actions for damages.

On balance, then, we believe that the claimed actions of misconduct on the part of the Wheaton directors, if they resulted in an injury, resulted in an injury to all shareholders and not to individual classes of shareholders. The activities engaged in by the directors did not impair or dilute any voting rights that the dissenters possessed as shareholders. Unlike the Cincinnati Milacron shareholders, Wheaton shareholders were all given the same opportunity. They simply had to make a choice. Nor did the directors deprive the dissenting shareholders of any information upon which they might base their decisions as shareholders. Actions that have the effect of depressing stock value harm all shareholders and are therefore classed as giving rise to derivative claims. *Kramer, supra,* 546 A.2d at 353; *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.1970). Likewise, because the nature of the injuries claimed in the North Jersey action is essentially to shareholder values, the RICO claims are also regarded as deriva-

tive. *Loewen v. Galligan,* 130 *Or.App.* 222, 882 *P.*2d 104, 112–13, *review denied,* 320 *Or.* 493, 887 *P.*2d 793 (1994).

We would be less likely to reach this result in the North Jersey action were it not for the concession of the Wheaton directors that the claims of disparate impact can be evaluated fairly in the appraisal action. *Breed, supra,* 444 *N.Y.S.*2d at 611, 429 *N.E.*2d at 130. New Jersey is firmly committed to majoritarian principles of corporate governance. *Musto v. Vidas,* 281 *N.J.Super.* 548, 560, 658 *A.*2d 1305 (App.Div.1995), *certif. denied,* 144 *N.J.* 588, 677 *A.*2d 761 (1996) (citing *Brenner v. Berkowitz,* 134 *N.J.* 488, 511, 634 *A.*2d 1019 (1993)). If the misconduct of Wheaton's directors damaged the corporation, Alusuisse–Lonza, as the majority shareholder, is now in the best position to determine whether to pursue that action if its merger agreement permits that. In sum, because we believe that any injury from self-dealing on the part of the directors was to all shareholders and because that conduct can be considered in the appraisal action, we reverse the judgment of the Appellate Division in the North Jersey action.

### IV

Anthony and Douglas Smith, two of the twenty-six original dissenting shareholders, now seek to intervene in these proceedings, to dismiss the appraisal action as to them, to restore their status as shareholders, and to receive the $63.00 per share payment from the merger. Proxy materials issued by the company stated that if its motion to dismiss the appraisal action were granted, the company would return all dissenting shareholders to their former status. Pursuant to this offer, the Smiths made a request to withdraw their demand for payment of fair value and to be reinstated as shareholders shortly after the announcement of the merger with Alusuisse–Lonza. Wheaton denied that request. Rather than take original jurisdiction of this issue, we remand this motion to Superior Court, Chancery Division. Even if there were not a binding contract, principles of simple justice should guide the discretion of the trial court in its consideration of Wheaton's

offer and the Smith defendants' acceptance. Other defendants, excluding the Smith defendants, have moved to reopen the record to include evidence of the Alusuisse–Lonza merger and for partial summary judgment. We remand these motions to the Superior Court, Chancery Division.

## V

The judgment of the Appellate Division in the *Strasenburgh* matter is reversed. The judgment of the Law Division dismissing plaintiffs' complaint is reinstated. The motion of the Smith defendants to intervene is denied.

The orders of the Chancery Division in the *Wheaton* matter denying the motions to dismiss the appraisal action are affirmed. The matter is remanded to the Superior Court, Chancery Division, Cumberland County for further proceedings in accordance with this opinion.

*For reversal and reinstatement in No. A–137*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.

*For affirmance and remandment in Nos. A–159 and A–169*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.